THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT FULTZ, Defendant-Appellant.

(No. 56084;

First District (2nd Division)—September 16, 1975.

Price, Cushman, Keck & Mahin, of Chicago (Dennis M. Wilson, George E. Weaver, and Robert F. Semmer, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Patricia Bobb, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HAYES delivered the opinion of the court:

Defendant-appellant Robert Fultz (hereinafter defendant) was indicted for the murder of one Pablo Garcia on the night of 30 September 1970. (Ill. Rev. Stat. 1969, ch. 38, par. 9—1.) On 7 December 1970, defendant filed a motion for the setting of preconviction bond. The said motion also contained allegations which the parties have mutually treated as constituting a motion to suppress a confession allegedly made by defendant to police officers on the night of 1 October 1970, and to suppress any in-court identification of him as Garcia's assailant by one Michael Ritche. After defendant had waived a jury trial, the trial court announced that the motion to suppress would be heard in conjunction with the trial. At that time defense counsel did not object to this procedure. When, as noted hereafter, the trial was first recessed for a hearing on the motion to suppress the oral statement, defense counsel, on cross-examination of the first State's witness at the hearing (Officer Foster), broadened the basis for the motion to suppress by additionally contending that the statement and any in-court identification by Michael Ritche were tainted fruits of the allegedly illegal arrest of defendant. Ultimately the motion to suppress was denied and defendant was found guilty of murder. After the denial of written post-trial motions in arrest of judgment and for a new trial, defendant was sentenced to a term of not less than 35 and not more than 75 years in the Illinois State Penitentiary. Defendant then filed this appeal.

In order to understand the several issues raised by defendant on this appeal, it is necessary to summarize in detail the sequential developments and testimony from the beginning of the bench trial.

The first trial witness for the State was an investigating officer (Officer O'Boyle) who merely testified that he arrived at 1166 North Milwaukee Avenue in Chicago (the address of the Lewis Hotel) at 9:30 a.m. on 1 October 1970. He observed the body of the victim on a stairwell between the third and fourth floors of the Hotel; rigor mortis had set in. He remained with the body until it was removed about 1:30 p.m.

The parties then stipulated that the victim's wife, if called, would testify that the victim was alive and in good health on 29 September 1970 and was dead on 1 October 1970.

Police Investigator Foster then testified that, in the company of In-

vestigators Thomas, Acosta, and Padar, he arrested defendant and one Lorraine Hayden at about 9:30 p.m. on 1 October 1970, and promptly advised defendant of his constitutional rights. Defendant replied that he had nothing to say except that he understood his rights. At about 10 p.m., defendant was taken to a police station. At about 11:30 p.m., the witness was in a room at the station with defendant and Investigators Griffin, Broderson, and Padar. At that time the witness heard Investigator Griffin say something to defendant, after which defendant made an oral statement. Defense counsel objected to any testimony by Foster as to the statement because there had been no hearing on the pretrial motion to suppress the statement. The trial court responded that the motion to suppress was to be heard in conjunction with the trial testimony; that, when there was some objection to the trial testimony relative to its suppression, the trial would be recessed for a hearing on the motion; and that such a point had now been reached.

Officer Foster continued to testify as the State's first witness on the hearing to suppress the statement. The grounds alleged for the motion to suppress the statement (as finally fully articulated in the post-trial motions) were as follows: that defendant had not made the statement; that proper *Miranda* warnings had not been given; that repeated prior requests for an attorney to be present had been ignored and the police questioning had continued; and that the statement had been made involuntarily and under duress. Officer Foster stated that he heard Officer Griffin advise defendant as to his constitutional rights; with respect to defendant's right to an attorney, Griffin had said defendant had such a right if he decided to waive his right to be silent. Foster then testified that he heard defendant give, in substance, the following oral statement: I (defendant) was in bed in a room with my girl friend Lorraine; there was a knock on the door and Maria Fischer entered the room with the victim and a young boy; I got out of bed and hit the victim in the face with my fist; Maria Fischer then hit the victim in the head with a frying pan, and the victim fell; I then shot the victim twice in the head; I do not wish to say anything further without consulting anyone. Foster stated that, at the time defendant made his statement, Investigators Griffin, Broderson, and Padar were also present. Defense counsel did not object to Officer Foster's recital of the substance of defendant's oral statement.

In response to further questions by the prosecutor, Foster added that defendant had also said that, after the victim had fallen, he (defendant) had taken some money from the victim's pocket and given it to Lorraine.

On cross-examination, Foster admitted that his arrest of defendant was a warrantless arrest and that his fellow officers had informed him of the facts of this case when he arrived to make the arrest on orders from

Officer Griffin. This line of questioning on cross-examination initiated defense counsel's additional contention that the arrest of defendant had been made without probable cause and was therefore illegal, so that the statement (as well as any in-court identification by Ritche, who was the young boy to whom defendant had referred in his statement) should be suppressed as a fruit of the alleged illegal arrest. This additional ground for suppression is important in that it served to make relevant a great deal of subsequent testimony at the hearing which would otherwise have been irrelevant.

On further cross-examination, Officer Foster was asked again about Officer Griffin's *Miranda* warnings to defendant just prior to defendant's statement; Foster's testimony this time reflected the giving of unobjectionable *Miranda* warnings.

The next State's witness at the hearing was Investigator Griffin, who appears to have been in charge of the whole investigation. He testified that he went to the Lewis Hotel at about 9:30 a.m. on 1 October 1970 to investigate a possible homicide; that he observed a body on the stairwell of the Hotel between the third and fourth floors; that he called investigators from the Crime Laboratory, who arrived about 20 minutes later; that he then proceeded to the fifth floor of the hotel, and looked into a service closet adjacent to room 522; that in the closet he found a large box containing a piece of blood-stained carpeting, pieces of glass, a frying pan, a radio, the victim's personal identification papers, broken bottles, and a bedspread, sheets and shorts, all of which were blood-soaked. Officer Griffin then testified that he consulted a hotel employee to find out which hotel rooms had carpeting like the blood-stained piece which he had found in the box. Defense counsel then objected on hearsay grounds to any testimony by Officer Griffin as to what the hotel employee had told him. The trial court overruled the objection on the ground that the hearsay testimony, unobjectionable as such in a hearing on a motion to suppress, was relevant to the issue of probable cause for arrest, which defense counsel had raised in cross-examining Officer Foster. Officer Griffin then testified that the hotel employee directed him to room 523; and in that room he observed the same type of carpeting, with a portion cut out of it which matched the blood-stained piece of carpeting which he had found in the box. Officer Griffin testified that he ascertained that the room was rented to a Mr. and Mrs. James Belles and that he found in the room identification papers, letters, and other objects indicating that a James Belles and a Maria Fischer had used the room.

Officer Griffin was thus led to James Belles, whom he questioned later that day. Defense counsel objected on hearsay grounds to any testimony by Griffin as to what Belles had told him, but the trial court overruled

the objection on the ground that the hearsay was relevant to the issue of probable cause for the warrantless arrest of defendant. Griffin then testified that Belles had explained that Maria Fischer had been his girl friend up to a few days before, but that he had not seen her since 26 September 1970. Belles then gave Griffin the names of "Fred" and "Lorraine" and the address of the building in which they lived (1063 North Milwaukee Avenue in Chicago). Belles also reported that Lorraine was associated with one Robert Fultz.

Griffin thereupon sent investigators to that building, who found and questioned one Fred Hall, age 20, in his apartment. Defense counsel objected on hearsay grounds to any testimony by Griffin as to what Hall had told the investigators, but the trial court overruled the objection on the ground that the hearsay was relevant to the issue of probable cause for defendant's arrest. Griffin then testified that Hall told the officers that Lorraine Hayden was his mother; that she was about 40 years old; that she had a younger boyfriend named Robert Fultz; that she and Fultz had an apartment in the building; that she and Fultz had entered Hall's apartment at about 7 a.m. that day (1 October 1970) and she had given Hall a .22-caliber revolver to take care of; and that defendant had then directed Hall not to say anything about the gun to his (Hall's) wife.

The officers took the revolver and sent it to the Police Crime Laboratory. While Griffin did not know whether any report had been made by the Crime Laboratory as to the gun (in fact, no such report was introduced by the State, nor was any check made for fingerprints on the gun), he stated that he knew that the bullets which were removed from the victim's body were .22-caliber bullets.

When Griffin admitted that he knew nothing of Hall's reputation for veracity (and the State successfully objected to defense counsel's attempt on cross-examination to learn what, if anything, Griffin knew about Belles' reputation for veracity), Griffin stated that he had been led to arrest defendant as a suspect for the homicide owing to Belles' description of defendant as a younger associate of Lorraine Hayden; and owing to Hall's report of the same association and of their delivery to Hall of a .22-caliber revolver on their visit to Hall's apartment at 7 a.m. on the same day (coupled with his (Griffin's) knowledge that the bullets which had killed the victim were .22-caliber bullets); and finally owing to a description of the participants in the incident which had been given to him in writing at the police station earlier that same evening by Michael Ritche, the State's only eye-witness to the incident.

For convenience, a portion of Michael Ritche's testimony, on direct examination at the hearing on the motion to suppress any in-court identification of defendant by him, may be anticipated at this point. He was

13 years old. At about 10 p.m. on 30 September 1970, he had been in the Subway Lounge (a bar located at Division Street and Ashland Avenue in Chicago), looking for his mother. A woman in the bar told him that his mother was at the Lewis Hotel with a man named Fred. Maria Fischer then telephoned the Hotel in an effort to locate the mother; Maria told Michael that his mother was not at the Hotel, but that he could stay with her at the Hotel for the night. On the way to the Hotel, Maria and Michael stopped at a restaurant where Maria encountered the victim and asked him whether he wanted to come up to her room at the Hotel. Thereupon, Maria, Michael, and the victim went to Maria's room at the Hotel, which was room 523. When they entered the room, a "colored" woman about 40 years old and a younger dark "colored" man, neither of whom was known to Michael, were already in the room. This was Michael's description of the man who, as he later testified, had shot the victim.

Again for convenience, it may be explained here how the police had been led to Michael. After the incident in room 523, which Michael witnessed, was all over, Maria Fischer told Michael not to tell anyone about it and then they all left, and Michael went to his own home, which he reached about 1 a.m. on 1 October 1970. During that day, Michael told a friend, one Johnny Valek, about the incident. Johnny in turn told his (Johnny's) father, who was a police officer. The father must have informed the police investigating this case, because later that same day, police officers came to the Valek home where Michael still was, discussed the incident with Michael, and then took him to the police station where Investigator Griffin was. At about 8 or 8:30 p.m., Michael gave Griffin a written statement about the incident which contained Michael's description of the male assailant.

Officer Griffin then testified to a post-arrest identification of defendant and Lorraine Hayden, made by Ritche in the police station after defendant and Lorraine had been brought to the station about 10 p.m. on 1 October 1970. It is this identification which defendant alleges was so improperly suggestive as to taint any in-court identification of defendant by Ritche, so that any such in-court identification must be suppressed. Since defendant presented an alibi defense, together with his own denial of any involvement whatsoever in the incident, the issue of identification is very important. Officer Griffin testified that Ritche told him that he (Ritche) had just emerged from a washroom in the police station when he saw defendant and Lorraine Hayden coming up a flight of stairs in the station. They were accompanied by police officers and their hands were handcuffed behind their backs. Ritche immediately and spontaneously identified them to a police officer who was accompanying him (Ritche) as

the "colored" man and woman who had been in room 523 when he arrived with Maria Fischer and the victim. Officer Griffin then testified that, owing to this chance identification by Ritche, no lineup or showup identification procedure had been arranged.

Griffin then testified as to the statement allegedly made by defendant. Defendant had been questioned by Griffin and another police officer from the time of his arrival at the police station at about 10 p.m. Defendant had refused to talk to an Assistant State's Attorney, but about 11:30 p.m. he agreed to make an oral statement to Investigators Griffin and Foster. Griffin thereupon gave adequate *Miranda* warnings to defendant, who said that he understood his rights. According to Griffin, defendant said that he and Lorraine Hayden were in bed together in room 523, having sexual intercourse, when Maria Fischer and a little kid and "a trick" came into the room; that he jumped off the bed and hit "the trick" in the face and knocked him down; that Maria hit the victim across the nose with a frying pan, which broke; that Maria took a scissors and cut the victim about the face and was trying to cut his jugular vein; that the victim fell on the floor and defendant took a .22-caliber revolver and shot the victim in the head twice; that he took money from the victim and gave it to Lorraine, and Maria wanted $9 extra because the victim was her "trick." Griffin added that he had in no way harassed or intimidated defendant. Defense counsel did not object to Griffin's recital of the substance of defendant's oral statement.

All of the foregoing testimony of Griffin was given by him as the State's second witness in the hearing on the motion to suppress. For the convenience of a State trial witness (Dr. Shalgos, a pathologist in the coroner's office), the hearing on the motion was then recessed, and the trial resumed. Dr. Shalgos testified that, on 1 October 1970, he had examined the body of Pablo Garcia. There were cuts on the head, face, neck, and chest. There were bruises over both eyelids, and there was evidence of a blow on the back of the head. There was a bullet wound in the left temple area and another bullet wound over the right eyebrow. Death was unquestionably related to the two bullet wounds, because the bullets had lacerated the brain. On cross-examination, Dr. Shalgos stated that, if a person having the number of cuts and stabs and the degree of bleeding which Pablo Garcia had suffered were then not to have any medical treatment, he would die, even without the bullet wounds which Garcia also suffered; nevertheless, it was Dr. Shalgos' opinion that in fact Pablo Garcia had died from the bullet wounds. After Dr. Shalgos' testimony, the trial was again recessed and the hearing on the motion to suppress was resumed with the cross-examination of Officer Griffin.

Defense counsel first questioned Griffin about some of the circum-

stances attendant upon defendant's oral statement. Griffin stated that he had asked defendant whether defendant wanted to give a statement to an Assistant State's Attorney; defendant said he did not. Then Griffin asked defendant whether defendant wanted to tell Foster and himself what had happened; defendant said he did. Griffin then asked defendant whether defendant had been given his constitutional rights, and Griffin himself then recited those rights to defendant again. Defendant then told the story to the substance of which Griffin had testified on direct examination.

Defense counsel then shifted to the matter of defendant's arrest, and questioned Griffin as to probable cause for that warrantless arrest. Griffin testified that, after he had obtained Ritche's written statement, he had ordered the arrest of defendant and Lorraine Hayden by Officers Foster, Padar, Acosta, and Thomas. The bases for his order were: 1) Belles' information as to Lorraine's association with one Robert Fultz; 2) Hall's information as to the association between his mother Lorraine and Robert Fultz; 3) Hall's report as to their visit to his apartment at 7 a.m. on 1 October 1970 and what they had said and done on that occasion, plus his (Griffin's) knowledge that the bullets taken from the victim's body were .22-caliber bullets; 4) Hall's description of defendant; 5) the information in Ritche's written statement as to the incident in room 523 and Ritche's description therein of the male assailant as a dark "colored" man about 25 years old. Griffin conceded that he knew nothing about Hall's reputation for veracity, and defense counsel's effort to establish the same lack of knowledge as to Belles' reputation for veracity was successfully objected to by the State. Defense counsel made the point that the descriptions which Griffin had of the male assailant and of Robert Fultz were equally applicable to Belles, in whose hotel room the incident had occurred, and to Hall, in whose possession a .22-caliber revolver had been found and who was also associated with Lorraine Hayden. The inference which counsel appears to wish to draw is that, where the description which the police have fits each of three possible suspects, the warrantless arrest of any one of those three must be deemed an arrest without probable cause.

The third witness called by the State in the hearing on the motion to suppress was Michael Ritche. Defense counsel objected to any testimony by Ritche because his is the crucial in-court identification, the suppression of which defendant also seeks in the motion being heard. The trial court overruled the objection because Ritche's testimony as to his station-house identification of defendant and of Lorraine Hayden was relevant to the motion to suppress any in-court identification of defendant by him, and because his written statement to Officer Griffin was

relevant to the issue of probable cause for Griffin to order the arrest of defendant.

On direct examination, Ritche began with the explanation, set out above for reasons of convenience, of how he came to enter room 523 of the Lewis Hotel with Maria Fischer and the victim at about 10:30 p.m. on 30 September 1970, and to see that defendant (whom he then pointed out at the hearing) and a black woman were already in the room. Ritche then testified that defendant began to hit the victim with his fists until the victim was knocked out. Maria Fischer hit the victim on the back of the head with a pan. Maria then took a scissors and began to cut the victim's throat. The witness turned his head away. Next he heard a gunshot but he did not see who fired the shot. Maria said there was only one bullet left in the gun. Then he saw defendant and Maria take money from the victim, and then they carried him out of the room into the hallway. When they returned, they cut off a piece of bloody carpeting and put it in a box in the closet. Maria told the witness that he had better not tell anyone about what had happened. Then they all left the room, and he was allowed to go to his own home, where he arrived about 1 a.m. on 1 October 1970. He had been in the hotel room for a period of about two hours. The room was a large one with a closet and a bathroom. Defense counsel did not object to Ritche's recital of the specific details of the incident.

Ritche then testified that he had been in the police station on the evening of 1 October 1970, had emerged from a washroom to encounter defendant and a black woman, and had immediately identified them as the man and woman who had been in room 523 when he entered that room with Maria Fischer and the victim.

On cross-examination, Ritche testified that he had never seen defendant before that night of 30 September 1970, but that he had gotten a good look at him during the incident in the hotel room. He had noted defendant's height and in his oral discussion with police officers he had estimated it at 6'2". He did remember that defendant had a beard at the time of the incident, but he had not reported that feature to the police. At the time of the hearing, defendant's beard and sideburns looked different than they had looked at the time of the incident. He did not remember how defendant was dressed. At about 8:30 p.m. on 1 October 1970 in the police station, he had emerged from a bathroom escorted by police officers and had encountered defendant and the woman who had been with defendant in the hotel room when Ritche had first entered the room; they were coming upstairs accompanied by police officers with their hands handcuffed behind them. He had then told

one police officer who was with him that they were the persons who had been in the hotel room when he had entered it.

At this point on cross-examination, defense counsel shifted his questioning from the matter of the station-house confrontation and began to question Ritche about the details of the incident in the hotel room. The trial court thereupon recessed the hearing on the motion and resumed the trial testimony. Still on cross-examination, Ritche testified that, when Maria had knocked on the door of room 523, he had not seen any light in the room, but there was a light in the hallway. As soon as he had entered the room, he went into the closet with the woman who had been in the room with defendant when Ritche and Maria Fischer and the victim had entered. There was a light in the closet, and he remained in the closet for 5 to 10 minutes. When he came out of the closet into the room, the events he related started to happen. He was looking out of the window when he heard the shot, so that he never saw the gun nor the person who had fired the shot. Maria had hit the victim with the pan about 45 minutes before Ritche finally left the room; the shooting had occurred about 10 minutes before he left. After the victim had been struck on the head, he never stood up again, but remained on the floor moaning until he was shot. Ritche thought that Maria had broken a bottle on the victim's head. Maria could not have shot the victim, because at the time of the shooting, the victim was on the floor next to the bed and Maria was on the other side of the room; so it must have been the defendant who shot the victim.

In order to impeach Ritche, defense counsel then brought out certain discrepancies in the details between Ritche's written statement given to the police and his instant testimony. In the written statement he said that it was the bathroom into which he had gone with the woman, and that he had done so after the shooting; in his testimony, he said that it was the closet into which he had gone with the woman, and that he had done so immediately after first entering the room and before the shooting. Ritche's response was that it had all happened a long time ago (in fact, about four months had elapsed), and he could not always recall correctly.

At the close of Ritche's cross-examination, the trial was recessed and the hearing on the motion resumed. Defense counsel moved for a mistrial on the ground that the motion to suppress should not have been heard in conjunction with the trial, because the hearsay testimony, which was properly admissible as such at the hearing on the motion to suppress, operated to deprive the defendant of his constitutional right of confrontation; and because the trial judge, who had to decide both the

admissibility of defendant's oral statement and then its truth or falsity, simply could not, owing to the developments in the instant case and owing to the fallibility of human nature, make those determinations separately and independently of each other, as required, and could not fail to be prejudiced in making his determination as to admissibility by having then already heard the substance of the confession. After a colloquy between the trial judge, the prosecutor, and defense counsel, a ruling on the motion for a mistrial was reserved until the close of all the evidence.

The fourth witness for the State in the hearing on the motion to suppress was Officer Padar. He testified merely that he had been present in the interrogation room of the police station at about 11 p.m. on 1 October 1970, and had heard Officer Griffin advise defendant of defendant's constitutional rights just before defendant made his oral statement. Defendant had said that he understood his rights and would make an oral, but not a written, statement. Padar did not observe any intimidation or harassment of defendant. The State then rested on the motion to suppress.

Defendant then testified in his own behalf on the motion. He stated that the arresting officer had merely asked him whether he was Bob. When he answered that he was, they simply arrested him for murder. He denied that he had received any *Miranda* warnings at the time of his arrest, but he had then refused to say anything. At the police station, he had been told that he could remain silent; that he had a right to have an attorney present and, if he could not afford an attorney, one would be furnished to him; that anything he said could and would be used against him, and "all that stuff". From about 9:30 to 11:45 p.m., he was asked some 25 to 30 times whether he wanted to talk to an Assistant State's Attorney. He had said that he did not, and that he wanted an attorney and would not say anything until he had consulted with an attorney. Notwithstanding his request for an attorney and his refusal to say anything without consulting an attorney, the police questioning had continued. He never did say anything except to deny that he had given a gun to Fred Hall. At one time when Sergeant Broderson was alone with him in the interrogation room, the sergeant had threatened to break his arms and ribs if he did not make a statement, and had intimidated him with threats that he would be imprisoned 40 or 60 to 100 years. When other officers returned to the room, they also threatened to break his arms, legs, and ribs.

The State cross-examined defendant on the matter of probable cause for his arrest. On redirect examination, defendant testified to an alibi. Defense counsel then rested on the motion to suppress.

In rebuttal on the motion, the State called Sergeant Broderson, who denied that he had ever threatened or intimidated defendant.

In argument on the motion, defense counsel contended that defendant had never given any statement at all; that any statement he may have given was involuntary; that defendant had not received any *Miranda* warnings; that defendant's requests for an attorney and for the suspension of police questioning until defendant had consulted an attorney and the attorney could be present had been ignored, and the questioning had continued. The State contended that the only real issue on the motion was the credibility of the several witnesses. The motion to suppress the oral statement and any in-court identification of defendant by Ritche was then denied.

The parties then stipulated to the admission into evidence at the trial of all testimony which had been heard on the motion to suppress. Defense counsel himself orally expressed the stipulation as follows:

"Any evidence that was heard, either properly or improperly, but was heard shall stand and be in the record and be considered as though it were repeated as part of the trial without repetition."

On this appeal, defense counsel maintains that he expressly preserved all his prior objections to the evidence thereby stipulated into the trial testimony (that is, the objections which he had interposed to the admissibility of testimony offered by the State at the hearing on the motion to suppress). Our examination of the record discloses that his express preservation of objections related solely to his objections to seven State exhibits which were introduced into the trial evidence by the State subject to the aforesaid objections; hence, counsel in fact did not expressly preserve his prior objections to the testimony admitted into the trial evidence by the stipulation. Even had he done so, such "preservation of objections" is ambiguous: (1) The "preservation" might simply mean that counsel's stipulation was not to be construed as a waiver of the objections which he had interposed to the admissibility of certain testimony offered by the State at the hearing on the motion to suppress. In this sense, it suffices to say that we have not so construed the stipulation on this review. (2) On the other hand, the "preservation" might mean that same objections which counsel had interposed to the admissibility of certain testimony offered by the State *at the hearing on the motion to suppress* were to be deemed also to have been interposed to the admissibility of the same testimony as stipulated into *the trial evidence*. In this sense, at least as to the hearsay and denial-of-confrontation objections which counsel had made to certain testimony at the hearing on the motion to suppress, we think that it is inherently contradictory for counsel to stipulate to the admission of such testimony into the trial evidence and then at the

same time attempt to preserve the said objections thereto, which would make admission reversible error. The trial judge in the instant case consistently made clear the sharp distinction between the admission of hearsay offered at the hearing on the motion to suppress and of hearsay offered at the trial itself. Finally, as to this matter, we note in addition that defense counsel failed to obtain any ruling by the trial court as to the matter of his preservation of his objections to the testimony admitted into evidence by the stipulation, so that, as to this matter, there is nothing before us for review.

The parties further stipulated to the admission into the evidence of the testimony of Dr. Shalgos, and defendant's age was stipulated to be 27, as a fact. The State then introduced into evidence seven exhibits subject to any defense objections which had been made to them. The State then rested its case-in-chief. The defense introduced one exhibit into evidence, and then called two witnesses to corroborate defendant's alibi defense. The first was defendant's wife, who testified that defendant had been home all night on 30 September 1970, and that he was recovering from an attack of bronchial pneumonia from which he had suffered throughout that month of September. The second alibi witness was a family friend who testified that she had visited the Fultzes in their home from 9:30 a.m. to 10 p.m. on 30 September 1970, and that defendant had been at home during that entire period. The defense then rested.

The trial judge denied defendant's prior motion for a mistrial and found defendant guilty of murder. After a hearing in aggravation and mitigation, defendant was sentenced to not less than 35 years nor more than 75 years in the Illinois State Penitentiary.

OPINION.

On this appeal, defendant first contends that the procedure used below of hearing his motion to suppress the confession in conjunction with his trial violated his constitutional right to due process of law, as developed in *Jackson v. Denno* (1964), 378 U.S. 368, 12 L.Ed.2d 908, 84 S.Ct. 1774. In that case, Jackson petitioned the appropriate Federal District Court for a writ of habeas corpus on the ground that his conviction of murder by a New York State trial court after a jury trial, had been based on a confession, the voluntariness of which, upon his timely raising of that issue, had been determined in a manner which violated his constitutional right to due process of law. The New York procedure for determining the voluntariness of a confession, when that issue had been timely raised, was as follows: The trial judge conducted a hearing in the presence of the jury and made a preliminary determination. Only if under no circumstances could the confession be deemed to have been voluntary would

the trial judge bar its admission into evidence in the jury trial as a matter of law. If there was a question as to its voluntariness, the trial judge would admit the confession into evidence, so that the jury then came to know, not only the fact that a confession had been made, but also the substance of the confession. At the close of all of the evidence, the trial judge instructed the jury that it must make a threshold determination of the voluntariness or involuntariness of the confession as a matter of fact; that, if the jury thereupon found as a threshold fact that the confession was involuntary, they were to disregard it; that, if on the other hand the jury found as a threshold fact that the confession was voluntary, then the jury was to accord to it such credibility and weight as the jury deemed appropriate. The Federal District Court found no violation of constitutional due process and denied the petition; the circuit court of appeals affirmed the denial. The United States Supreme Court then granted certiorari.

That court then held that the New York procedure did violate the petitioner's constitutional right to due process of law, so that his conviction must be reversed and the cause remanded for a new trial. Specifically, the court held: (1) that a conviction cannot be based in whole or in part on an involuntary confession, even if in fact the substance of the confession is found to be true; (2) that a defendant must have the right to raise the issue of voluntariness at some stage of the criminal proceeding and before the confession is admitted into evidence; (3) that, when the issue of voluntariness has been timely raised, there must be a hearing on, and a reliable determination of, that issue, uninfluenced by any consideration of the truth or falsity of the confession and the probative value to be accorded to it. The Court then concluded that, under the New York procedure, it was impossible to determine whether the jury had followed the instruction as to making the threshold determination; and it was also impossible to determine whether the threshold determination, if made, had been uninfluenced by consideration of the truth or falsity of the confession. The evidence given to the jury "inevitably injects irrelevant and impermissible considerations of truthfulness of the confession into the assessment of voluntariness. Indeed the jury is told to determine the truthfulness of the confession in assessing its probative value. As a consequence, it cannot be assumed * * * that the jury reliably found the facts [as to voluntariness] against the accused."

Hence, the case holds that, when a criminal defendant timely exercises his constitutional right to object to the admission of his confession into evidence by raising the issue of its voluntariness, he is then constitutionally entitled to an evidentiary hearing on the issue, which hearing must

be such as to produce a reliable determination of that issue, uninfluenced by considerations relating to the truth or falsity of the confession. And, in future trials, that determination must be made, out of the presence of the jury which is adjudicating the guilt or innocence of the defendant, by the trial judge or another judge or another jury and must be made prior to the admission of the confession to the adjudicating jury. We note that the case relates solely to a jury trial and contains no reference to a bench trial. Consequently, what defendant's first contention seeks is an extension of the holding of *Jackson v. Denno* to this bench trial by analogy.

■■  Insofar as *Jackson v. Denno* requires: (1) that defendant have, at some stage of the criminal proceeding and before his confession is admitted into evidence, the right to object to its admission on the ground that it was involuntarily made; and (2) that defendant have the right to an evidentiary hearing on his motion to suppress the confession on that ground, which hearing is separate from his trial and conducted out of the presence of the jury which is adjudicating his guilt or innocence, there is no need to extend that decision to this or any bench trial, because under Illinois law defendant had those rights long before the decision in *Jackson v. Denno*. (*People v. Wagoner* (1956), 8 Ill.2d 188, 196-97, 133 N.E.2d 24, 29-30; *People v. Jackson* (1964), 31 Ill.2d 408, 202 N.E.2d 465; *People v. Taylor* (1965), 33 Ill.2d 417, 211 N.E.2d 673.) In fact, Illinois has long held that, where the competency (*i.e.*, admissibility) of a confession is timely put at issue, that issue must first be determined by the trial judge before the admission of the confession into evidence, and that issue can never be left to the jury which is adjudicating the guilt or innocence of the defendant, because that issue is one of law and not of fact. *People v. Fox* (1925), 319 Ill. 606, 618, 150 N.E. 347; *People v. Roach* (1938), 369 Ill. 95, 15 N.E.2d 873; *People v. Wagoner*.

In the instant case there was no violation of any of those rights. There *was* a separate determination of the admissibility of the confession, made after a hearing on the motion to suppress it and before the confession was admitted into evidence. The hearing was no less a separate hearing for having been held in conjunction with the trial. While the procedure of hearing the motion to suppress in conjunction with the trial, by recessing the trial when the matters sought to be suppressed were reached in the course of the trial, may not be the most effective procedure and may be, as a matter of sound judicial policy, a procedure to be used only sparingly and with caution, nevertheless the procedure *as such* did not violate any of defendant's rights to due process of law. Under the procedure, the determination of the admissibility of the confession was made (1) by the trial judge (2) as an issue of law (3) after a separate

hearing on the motion to suppress it, and (4) before it was admitted into evidence.

On careful analysis, then, it becomes clear that the only constitutional "due process" right established in *Jackson v. Denno* which defendant's first contention on this appeal seeks to have extended to this bench trial by way of analogy, is the right to have the determination of the voluntariness of his confession made, uninfluenced by any consideration of its truth or falsity. The real thrust of defendant's contention is that, at least as things actually developed in this bench trial under the procedure adopted by the trial judge of hearing the motion to suppress in conjunction with the trial, the trial judge (who must first determine voluntariness as a matter of law and then determine truth or falsity and probative value as matters of fact) cannot be assumed reliably to have found the issue of voluntariness against the defendant; on the contrary, the trial judge, owing to human fallibility and despite his long experience as a trial judge in bench trials, must be assumed to have been prejudiced in his determination of voluntariness by an inevitable simultaneous consideration of the truth or falsity of the confession. The latter is what *Jackson v. Denno* held as to the lay jury which was adjudicating Jackson's guilt or innocence and which, under the prescribed New York procedure, had before it at the time it was required to make the threshhold determination as to voluntariness both the testimony as to the voluntariness of the confession and the testimony as to its substance. And that is what defendant asks us to hold as to the trial judge in this case who, at least as things developed in this case under the procedure being followed, had before him the same complete evidence at the time he was required to determine the issue of voluntariness.

Once defendant's contention is analyzed and dissected as above and its thrust is exposed for what it really is, the following conclusions in our opinion are inescapable: (1) There is no valid analogy between the jury and the trial judge in this respect owing to the training and experience of the trial judge, which are the very attributes which the lay jury lacks. (2) There can be no *assumption* that the trial judge cannot make a *reliable* determination of the voluntariness of the confession under the circumstances which developed in this bench trial, and there can be no assumption of his inevitable prejudice in making that determination; rather, there must be some indication in the record which demonstrates actual prejudice.[1] (3) In any event, the alleged potential

---

[1] We are not persuaded by *United States ex rel. Spears v. Rundle* (E.D. Pa. 1967), 268 F. Supp. 691, *aff'd* (3d Cir. 1969), 405 F.2d 1037, upon which defendant relies, because in that case there was no hearing whatever, as distinguished from the trial itself.

for prejudice in the determination of the voluntariness of the confession in this case cannot be attributed to the procedure of hearing the motion to suppress in conjunction with the trial. Such alleged potential is instead directly attributable to the failure of defense counsel, in the hearing on the motion, to object to the recital of the substance of the confession by Investigators Foster and Griffin, and by his similar failure to object to Ritche's testimony, on direct examination at the hearing on the motion, as to the details of the incident in the hotel room other than those details which related solely to Ritche's ability to identify the defendant. We note also in passing that defense counsel did not object to the procedure of hearing the motion to suppress in conjunction with the trial when the trial judge first announced that he proposed to follow it; counsel's first objection came in his motion for a mistrial when he had observed the alleged potential for prejudice arising from the developments which had occurred in the course of the hearing on the motion, which developments were attributable, as we have just noted, not to the procedure being followed, but to his own failure to object to portions of the testimony elicited by the State in the hearing on the motion.

Despite defense counsel's failure to object, we would not hesitate to invoke the doctrine of plain error in order to vindicate defendant's constitutional right to due process, if the record demonstrated any *actual* prejudice on the part of the trial judge. But the record contains no such demonstration. On the contrary, the record shows a consistent awareness by the experienced trial judge of the distinction between the two determinations which he was required to make and of the testimony which was competent for the purpose of each determination (as well as of the distinction between the trial and the hearing on the motion in respect of the admissibility of hearsay testimony). In addition, it is elementary that, in the absence of some indication to the contrary in the record, there is a presumption that the trial judge as the trier of fact in a bench trial has considered only competent evidence in making his findings of fact. (*People v. Pelegri* (1968), 39 Ill.2d 568, 237 N.E.2d 453.) The necessary corollary is that the trial judge in a bench trial is presumed to have considered testimony solely for purposes for which that testimony is competent.

■■ We conclude that the procedure of hearing the motion to suppress in conjunction with the trial did not, either as such or in the context of the developments which resulted, not from, but during, the use of the procedure in the instant case, violate the defendant's constitutional right to due process of law.

In this appeal, defendant has also attacked the procedure of hearing the motion to suppress in conjunction with the trial on the further ground

that the procedure violated a statutory right of defendant to a separate and prior determination of the issue of the voluntariness of his confession. The statute upon which defendant relies is section 114—11 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1969, ch. 38, par. 114—11). The relevant subparagraphs are as follows:

"(a) Prior to the trial of any criminal case a defendant may move to suppress as evidence any confession given by him on the ground that it was not voluntary.

(b) The motion shall be in writing and state facts showing wherein the confession is involuntary.

(c) If the allegations of the motion state facts which, if true, show that the confession was not voluntarily made the court shall conduct a hearing into the merits of the motion."

The parties agree that a separate determination means a determination reached after a hearing on the motion to suppress, which hearing is separate from the trial. Even though section 114—11(c) does not expressly require that the hearing on the motion shall be separate from the trial, the State does not contend that the said subparagraph does not require such a separate hearing; hence, the parties are not at issue as to the statutory requirement of such a separate hearing. Nor does the State contend that the conceded separate-determination requirement of section 114—11 does not apply in a bench trial.

The parties are at issue as to whether in fact the hearing in the instant case constituted such a separate hearing. We find that it did. Despite the interspersal of trial testimony and testimony at the hearing, the trial judge was meticulous in recessing the trial and initiating the hearing, and then in recessing the hearing and resuming the trial, and then in recessing the trial and resuming the hearing.

The real issue between the parties as to whether the statutory right of defendant was violated relates to defendant's contention that the statute conferred upon him a right to a *prior* determination of the voluntariness of his confession, which prior determination was not made, and to the State's contention that a prior determination was made. It develops that, as to the matter of whether a prior determination was or was not made, defendant is referring to a determination made prior to the trial itself while the State is referring to a determination made prior to the admission of the confession into evidence at the trial. The State does not contend that section 114—11 does not require a prior determination in the State's sense of that term.

As we read the statute, it does not require that the determination of the voluntariness of the confession be made prior to the beginning of the trial itself, even when the motion to suppress is a written pretrial motion.

Further, the record is clear that, after a full hearing on the motion to suppress, there was a determination that defendant's confession was voluntary before the confession was admitted into evidence at the trial, so that there was a prior determination of voluntariness in that sense. Defendant's reliance on *People v. Sims* (1969), 113 Ill.App.2d 58, 251 N.E.2d 795, is misplaced; that case clearly required merely that, when the competency to testify of a witness under the age of 14 is timely questioned, the trial judge must conduct a separate preliminary inquiry as to the competency of the witness and make a determination of competency prior to the *admission into evidence* of the testimony of the witness.

For the foregoing reasons, there is no merit to defendant's contention that the procedure of hearing the motion to suppress in conjunction with the trial violated any right conferred upon defendant by section 114—11.

■■ Defendant's second principal contention on this appeal relates to the merits of his motion to suppress his oral statement. He contends: 1) that the evidence as to the voluntariness of the statement was legally insufficient to support the finding of voluntariness in view of his testimony as to the threats of physical harm made by police officers and especially by Sergeant Broderson; 2) that the evidence as to whether adequate *Miranda* warnings were given was legally insufficient to support the finding that they had been given; 3) that the continuance of police interrogation after defendant had requested the presence of an attorney and had refused to say anything until he had consulted with an attorney constituted reversible error; 4) that, even if adequate *Miranda* warnings were given, the record contained no showing of any waiver by him of his constitutional rights.

As to subcontentions (1) and (2) above, the real issue is the credibility of the witnesses, which is a matter for the trial judge; and there is ample testimony which, if believed, supports each of the findings so that neither finding is against the manifest weight of the evidence. (*People v. Higgins* (1972), 50 Ill.2d 221, 278 N.E.2d 68; *People v. Johnson* (1969), 112 Ill.App.2d 148, 251 N.E.2d 393.) Officer Foster's testimony on direct examination as to the specific *Miranda* warnings given to defendant by Officer Griffin at the start of the police interrogation at the police station could be construed as having imposed an improper condition precedent upon defendant's right to have an attorney present (to-wit, if defendant decided to waive his right to be silent). But Officer Foster did not testify that Officer Griffin had said "only if"; and, in any event, Officer Foster's testimony on cross-examination as to the specific *Miranda* warnings which Officer Griffin had given to defendant just before defendant made his oral statement did not reflect any improper

conditioning of defendant's rights. In addition, Officer Griffin's testimony as to the *Miranda* warnings which he had again given to defendant just before defendant made his oral statement does not disclose any impropriety or inadequacy in the warnings. Finally, defendant's own testimony concedes that he was given the *Miranda* warnings at the police station at the start of the police interrogation, and his account of the specific warnings which he then received discloses no impropriety or inadequacy in those warnings.

As to subcontention (3), it was defendant who testified that his request, made during the police interrogation, for the presence of, and an opportunity to consult with, an attorney had been ignored and that the police interrogation had continued despite that request. On the other hand Officer Foster testified that it was only after defendant had completed his oral statement that he said he did not want to say anything further without consulting someone. There was, therefore, a conflict in the testimony as to *when* defendant had expressed his wish to consult with someone before saying anything. Hence, the issue once again is simply credibility and a matter for the trial judge to resolve. We cannot say that his determination was against the manifest weight of the evidence. *People v. Higgins; People v. Johnson.*

■■ In developing subcontention (4) as to the absence of any record showing of waiver by defendant of his constitutional rights, defendant relies on *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602, and *People v. Landgham* (1970), 122 Ill.App.2d 9, 17, 18, 257 N.E.2d 484, *cert. denied,* 402 U.S. 911. Defendant points out that *Miranda* held that, prior to custodial interrogation, a suspect must be made aware that he has the right to remain silent; that any statement he makes may be used against him; and that he has the right to have an attorney present during the interrogation, either retained or appointed. *Miranda* held further that, where a statement in fact was made by a defendant without the presence of an attorney, a heavy burden rests on the State to show that the defendant had knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. The United States Supreme Court then gave an example of circumstances which could constitute a showing of a valid waiver, namely, where the record shows that, after adequate warnings had been given, defendant expressly said that he was willing to make a statement and that he did not want an attorney, which express statement was then closely followed by the making of the inculpatory statement. The United States Supreme Court also gave an example of circumstances which would not constitute a showing of a valid waiver, namely, where the record merely shows that, after adequate warnings had been given,

defendant said nothing in response to the warnings, or merely shows that an inculpatory statement was in fact obtained from defendant shortly after the warnings had been given; no presumption of knowing waiver is created by such a record. The United States Supreme Court then added that both the warnings and the waiver required by their decision in the case were, "in the absence of a fully effective equivalent," prerequisites to the admissibility of any statement made by a defendant.

In *People v. Landgham,* this court reviewed the *Miranda* decision in substantially the same terms as set out just above, and concluded that presuming a waiver from a silent record was impermissible and, specifically, that the record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. While agreeing that the record need not contain an express statement of waiver, this court rejected the contention that the mere making of an inculpatory statement shortly after adequate warnings had been given was in itself an adequate record showing of waiver. In a footnote, this court cited *People v. Johnson* (1969), 112 Ill.App.2d 148, 155-56, 251 N.E.2d 393, as an example of a case in which the record showed circumstances from which this court had found an adequate record showing of waiver of defendant's constitutional rights.

We think the instant case on its facts in respect of waiver falls within the *Johnson* decision and the later decision of our supreme court in *People v. Higgins* (1972), 50 Ill.2d 221, 226, 227, 278 N.E.2d 68. In *Johnson,* the record showed that, after adequate warnings had been given and after defendant had expressly said that he understood each right as each was stated to him, defendant then gave an oral inculpatory statement without the presence of an attorney, but refused to make a written statement. This court held that the record showing constituted a fully effective equivalent to an express record statement of waiver. In so holding, this court focused (1) on the express statement by defendant that he understood the constitutional rights of which the warnings made him aware, and (2) on the refusal of defendant to make a written statement; that refusal, this court observed, demonstrated both the defendant's actual awareness and knowledge of his constitutional rights and his ability to exercise them, which same knowledge and ability he also had when he gave his oral inculpatory statement. In the instant case, the record shows that Officers Griffin and Padar testified that, when Officer Griffin had given adequate *Miranda* warnings to defendant just before defendant gave his oral inculpatory statement, defendant had said that he understood his constitutional rights. In addition, the record shows that Officer Griffin testified that defendant had consistently refused to talk to

an Assistant State's Attorney, and Officer Padar testified that defendant had refused to make a written statement. Hence, in the instant case the record shows the same two circumstances which this court in *Johnson* held to constitute a fully effective equivalent to an express record statement of waiver.

In the later case of *People v. Higgins,* defendant had made an oral inculpatory statement after having been questioned at a police station about one hour after his arrest and after adequate *Miranda* warnings had been given. A few hours later, defendant signed a written statement of substantially the same inculpatory nature. After a hearing on defendant's motion to suppress both statements because both were allegedly involuntary and because there was no record showing of waiver, both statements were admitted into evidence. On review, as to the waiver contention in respect of the prior oral statement, the Illinois Supreme Court pointed out that the defendant had been given adequate *Miranda* warnings both at the start of the interrogation and again just before he made his oral statement; and on the latter occasion, defendant had said that he understood his constitutional rights. In holding that there was a sufficient record showing of waiver, the Illinois Supreme Court said at page 227 of *Higgins:*

> "As in the present case, '[o]nce the defendant has been informed of his rights and indicates that he understands those rights, it would seem that his choosing to speak and not requesting a lawyer is sufficient evidence that he knows of his rights and chooses not to exercise them.' *People v. Johnson,* 70 Cal.2d 541, 450 P.2d 865, 876."

We conclude that in the instant case there was a record showing of circumstances which constituted a fully effective equivalent to an express record statement of waiver.

■■ Defendant's third principal contention on this appeal relates to the merits of his motion to suppress any in-court identification of him by Michael Ritche on the ground that Ritche's station-house identification was so impermissibly suggestive on the part of the police as to taint any subsequent in-court identification. The thrust of the contention is that, when Ritche identified defendant and Lorraine Hayden in the police station, they had their hands handcuffed behind their backs and they were being escorted by police officers. But, in order for the contention to have any substance, the police must be found to have arranged these "suggestive" circumstances for the edification of Michael Ritche at the time they had also arranged for him to view defendant and Lorraine Hayden in the police station. It is obvious that the police had made no such arrangements and, indeed, had made no arrangements whatsoever.

The encounter was a chance encounter which the police not only did not arrange but could not reasonably have foreseen so as to prevent it. Moreover, Ritche's identification of defendant to a police officer immediately after the encounter was spontaneous. A case involving the same type of accidental station-house viewing and identification (though lacking the accompanying "suggestive" circumstances of the handcuffs and the police escort) is *People v. Wright* (1970), 124 Ill.App.2d 223, 260 N.E.2d 265. Owing to the absence of any indication that the police arranged either the encounter itself or the "suggestive" circumstances, we find that defendant's contention has no merit. We note further that there existed an ample independent basis for an in-court identification of defendant by Ritche in that Ritche had been in the hotel room with defendant and Lorraine Hayden for a two-hour period during which the events to which he testified had occurred.

■■ Defendant's fourth principal contention on this appeal relates to the merits of his motion to suppress both his oral statements and any in-court identification of him by Ritche on the ground that both were the tainted direct fruits of his warrantless arrest without probable cause. In *People v. Peak* (1963), 29 Ill.2d 343, 348, 194 N.E.2d 322, 325, the Illinois Supreme Court said:

> "Probable cause for arrest exists when the facts and circumstances within the arresting officer's knowledge, and of which he had reasonable and trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in believing that an offense has been committed, and that the person arrested is guilty. [Citations.]"

In *People v. Fiorito* (1960), 19 Ill.2d 246, 255-56, 166 N.E.2d 606, 612, the Illinois Supreme Court also said:

> "A completely satisfactory determination of what constitutes reasonable cause for arrest by an officer without a warrant is difficult to formulate. The recurring question must be resolved by the facts and circumstances of each case. In deciding the question in a particular case the courts deal with probabilities and are not disposed to be unduly technical. They must act upon 'the factual and practical considerations of everyday life upon which reasonable and prudent men, not legal technicians, act.' [Citations.]"

In the instant case, Officer Griffin's testimony as to the chain of circumstances which led him to order defendant's arrest was clearly sufficient to support the trial judge's determination that there was probable cause for the warrantless arrest by the police. We reject defendant's suggestion that, where the description which the police have of the assailant fits defendant but could also fit other persons who had become

involved in the police investigation, there then exists no probable cause to arrest either defendant or any of those other persons. We think the more reasonable conclusion is that there then exists probable cause to arrest any one of such persons. We also reject defendant's suggestion that, since Officer Griffin had no knowledge of Hall's reputation for veracity, it must follow that Griffin cannot have found Hall's information to have been trustworthy. In the above-quoted words of the Illinois Supreme Court in *Fiorito:* "In deciding the question in a particular case the courts deal with probabilities * * *." So do the police. While Officer Griffin did not know Hall's reputation for veracity, neither did he know of any circumstance which raised even the possibility, much less the probability, that Hall's information was untrustworthy. Hall was not, for example, a police informer. Moreover, the circumstance that Hall had *voluntarily* produced and surrendered the .22-caliber revolver, with the prior possession of which he linked defendant and Lorraine Hayden, is a circumstance supporting the probability that his information was trustworthy. We affirm the decision of the trial judge that probable cause existed for the warrantless arrest of defendant by the police.

■■ We note here that, in objecting on hearsay grounds, at the hearing on the motion to suppress, to the admission of Officer Griffin's testimony as to what Hall had told the investigating officers who interviewed him in his apartment, defense counsel also adverted to a second ground for his objection, namely, that the admission of Griffin's testimony would deprive defendant of his constitutional right to confront and cross-examine Hall. Defense counsel later reiterated this objection as one ground for his motion for a mistrial. It must be borne in mind that no hearsay testimony was involved as to any of the grounds urged for the suppression of defendant's oral statement *as such,* nor was any hearsay testimony involved as to the "impermissibly suggestive" ground urged for the suppression of any in-court identification of defendant by Ritche. The only hearsay testimony which was involved at the hearing on the motion to suppress was related to the contention of defendant that both his oral statement and any in-court identification by Ritche must be suppressed because both were fruits of the arrest of defendant without probable cause. Hence, the additional ground of objection to Griffin's hearsay testimony as to what Hall had told the investigating officers (namely, that the admission of the testimony deprived defendant of his constitutional right to confront Hall) was made in the context of a motion to suppress the tainted fruits of an arrest without probable cause. In that respect, the hearing on the motion amounted to a preliminary hearing on the existence of probable cause to arrest defendant without a warrant. We emphasize that Hall's statements were not being admitted on the

issue of defendant's guilt or innocence. We emphasize further that Hall's statements merely contributed to Griffin's conclusion that there was probable cause to arrest defendant without a warrant; Griffin's conclusion might well have been based solely on Ritche's written statement, and Ritche did confront defendant at the hearing on the motion to suppress. So did Griffin and Foster. We conclude that, under the circumstances, defendant had no constitutional right to confront Hall at the hearing on defendant's motion to suppress. *Gerstein v. Pugh* (1975), 420 U.S. 103, 120-22, 43 L.Ed.2d 54, 95 S.Ct. 854; and see *McCray v. Illinois* (1967), 386 U.S. 300, 18 L.Ed.2d 62, 86 S.Ct. 1056.

■■ Defendant's final contention on this appeal is that the evidence for the State was insufficient to convict him beyond a reasonable doubt. The thrust of the contention, in view of defendant's denial that he was the victim's assailant and in view of his alibi defense, is directed at the State's identification evidence. Even prescinding from defendant's confession, the positive identification of defendant by the State's eye-witness Ritche is legally sufficient to convict defendant beyond a reasonable doubt, even were it uncorroborated. (*People v. Jones* (1975), 60 Ill.2d 300, 325 N.E.2d 601.) In fact, however, it was significantly corroborated, for example, by the testimony of Hall as stipulated into the trial evidence. When one then adds the confession, it is clear that defendant was proved guilty beyond a reasonable doubt.

For the foregoing reasons defendant's conviction is affirmed.

Judgment affirmed.

DOWNING, P. J., and STAMOS, J., concur.