THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN MACK, Defendant-Appellant.

First District (6th Division)   No. 1—88—0902

Opinion filed June 28, 1991.

Randolph N. Stone, Public Defender, of Chicago (Bruce Landrum, Assistant Public Defender, of counsel), for appellant.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Gael O'Brien, and Susan S. Wigoda, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

A jury convicted the defendant, John Mack, of aggravated criminal sexual assault; he was sentenced to a term of 30 years in the Illinois Department of Corrections. He contends that he was not proved guilty beyond a reasonable doubt and that the judge erred when he permitted the eight-year-old prosecutrix to testify.

Before trial the defendant filed a motion *in limine* to preclude the testimony of S.R., who was eight years old. On direct examination, S.R. testified that she had three brothers and one sister. She was in second grade and lived with her grandparents. She knew her colors and the days of the week. She knew the difference between the truth and a lie, but she did not know the name of the city where she lived.

On cross-examination, she stated the assistant State's Attorneys told her what to say. They rehearsed the questions and answers a number of times. She then said she did not know the difference between the truth and a lie; she did not know what a courtroom was; and she could not read, print or add numbers.

On redirect examination, she said that the assistant State's Attorneys did not give her the answers to the questions; they were her own answers.

On re-cross-examination, she said that the assistant State's Attorney told her what to say. She told her what to tell the judge about what happened with the defendant; she did not know the difference between the truth and a lie.

Before ruling, the judge asked S.R. what color a particular book was, and S.R. answered correctly. The judge found S.R. to be "plainly competent" and denied the motion to bar her testimony.

She testified that she lived with her grandparents, Rose and Earl. She used to live with her mother, Sherlie Ann Richardson, her grandmother, Gracie Farr, and her Uncle Neil. Her brothers, Anthony, Cortes and Fonzo, and sister, Crystal, also lived there.

She was in bed in her mother's room when the defendant (Pumpkin) woke her up. He was taking off his shoes and shirt, and then he got into bed with her. He took off her panties and started licking her "cat" with his tongue. She stood up and showed the jury where the defendant was licking her by pointing to her vagina. She also showed the jury how the defendant licked her by using her fingers in a repeated motion from front to back.

After the defendant began licking her, he slapped her in the left cheek. She screamed for her grandmother, and the defendant told her to shut up. She then asked to go to the bathroom, but the defendant said, "No." She then "peed" in the bed because "she had to go to the bathroom." The defendant then started licking her vagina again.

The next thing she remembered was that her brother Cortes, her Uncle Neil, and her Grandmother Gracie came into the room. Uncle Neil turned on the light and the defendant jumped up. Neil

asked the defendant what he was doing, and the defendant said, "I thought it was a cat." S.R. then went to her grandmother's room with only a T-shirt on.

During her testimony, S.R. also used an anatomically correct doll to demonstrate what the defendant did to her. She took the doll's panties off and said that the defendant started licking her in the vagina. She demonstrated by pointing to the vaginal area on the doll. She also used an open hand to show on the doll how the defendant slapped her left cheek as he told her to "shut up." She also showed how the defendant covered her mouth with his hand as he told her to shut up, and how he bit her navel.

Later, while in her grandmother's room, S.R. told her Uncle Neil that the defendant had "juiced" and slapped her. A few days later, some police came to her house and showed her photographs. She identified the defendant from the photographs and also identified him in court.

On cross-examination, she stated that she was telling the truth at her competency hearing when she testified that the prosecutor told her what to say about the defendant. She rehearsed the story with the prosecutor over 10 times. She also stated that she talked to the police and told them of the incident; but she did not tell them that the defendant took off his pants. She also told social workers of the incident that the defendant put his thing in her vagina; but the thing she was referring to was his tongue. She was repeating the second grade and was making all "F's."

On redirect examination, she said that the prosecutor did not coach her. On re-cross-examination, she repeated that she was coached and that she did not know what the truth or a lie was.

Dr. Maria Cruz, a pediatrician, testified that she saw S.R. on December 23, 1986, in the pediatric emergency room at Mt. Sinai Hospital. She interviewed S.R. alone, and S.R. told her that her mother brought her to the hospital "because a John Mack or Pumpkin tried to *** suck her, bite her, juice her."

Dr. Cruz testified that there was a "diffused or reddened area" on S.R.'s left cheek that was consistent with her having been slapped. She also stated that the examination of S.R. showed that her "labia were swollen and red." Over S.R's "left labial fold, there was a *** strand of hair which was thick, about 5 centimeters." She testified that, since S.R. did not have pubic hair, that hair should not have been there. Her clinical findings were "definitely" consistent with "someone having licked [S.R.'s] vagina."

S.R.'s uncle, Cornelius Farr, who is called Neil, testified that he was awake at 5 a.m. giving his grandmother some medicine. He let the defendant into the house. The defendant was looking for S.R's. mother, Sherlie Ann. The defendant went to Sherlie Ann's room, where S.R. was sleeping. Suddenly, Neil heard a scream coming from his sister's room. He ran to the door with his mother and Cortes, S.R.'s brother, opened the door and turned on the light. He saw the defendant jump off his niece and off the bed. He asked the defendant what he was "doing to her." The defendant said, "I thought it was a cat or something like that."

Neil testified that S.R. was crying when he came into the room. She told him the defendant slapped her twice on her face; her face was red. She was wearing a top and no panties. Neil then sent her to her grandmother's room. After a few minutes, S.R.'s mother came home, and she went with Neil to a pay phone to call the police. The defendant left when they went to call the police.

Cortes Farr testified that he was asleep at home when a knock on the front door woke him up. He answered the door with his Uncle Neil. The defendant was at the door and asked if Cortes' mother, Sherlie Ann, was home. Neil said she was not home, and the defendant went to her room and closed the door. Cortes was talking to his uncle and grandmother when about three or four minutes later he heard his sister scream. S.R. was screaming, "Grandma." When Cortes and Neil got to Sherlie Ann's room, Neil opened the door and turned on the light. He saw "Pumpkin Mack with his head down by [his] sister's vagina." The defendant and S.R. were in the bed.

When Neil turned on the light, the defendant jumped up. Neil asked S.R. "What did he do?" S.R. said, "He slapped me two times." Cortes noticed that the defendant had no shirt or shoes on and his pants were unzipped. S.R. was lying on top of the bed and was crying. She was only wearing a top. He noticed that the left side of her cheek was red. S.R. told her grandmother, "He slapped me twice, and then he tried to juice me." Cortes and Neil asked the defendant what he did to S.R., and he said he did not do anything.

When his mother came home, Cortes went with her and Neil to call the police. The defendant walked behind them "and then he went through this alley, and then he disappeared."

After S.R. identified the defendant's picture to the police, his name and picture were submitted to the Chicago Police Daily Bulletin.

Officer John Patton testified that he saw a Chicago Police Daily Bulletin with the defendant's picture in it. On February 3, at about 1 a.m., he was off duty near 3800 West Chicago Avenue. He saw the defendant entering a motorcycle club house at 3803 West Chicago. Patton went to a pay telephone, dialed 911 and requested uniformed officers to assist. When the officers arrived, Patton entered the motorcycle club house and went to the rear, where he saw the defendant seated at a table. When the defendant saw the officers, he got up and ran. Patton caught the defendant at the rear door.

Detective James Schreiner testified that he interviewed the defendant after advising him of his rights. The defendant told him that he entered the home at 4:30 a.m. looking for S.R.'s mother. He went into her bedroom and lay down to wait for her. Suddenly, he heard a little girl screaming. He later repeated the same story to Assistant State's Attorney David Cuomo.

Earl Johnson, a former police officer, testified for the defendant that Officer Patton hated the defendant. On one occasion, Patton got into an argument with the defendant at the Demons Motorcycle Club. Johnson also said that the defendant lived with him for three months and baby-sat for his children.

The defendant testified that he met Sherlie Ann Richardson in February 1986 through his "godbrother" Roger Harris. Sherlie Ann and Roger were being harassed and threatened by people in the neighborhood, whom they owed "drug money." The defendant told them that he would talk to the persons that were threatening them. He stayed with Sherlie Ann for two weeks; he also paid off the $1,500 Sherlie Ann and Roger owed the drug dealers.

He testified that he went to Sherlie Ann's home on December 23 to collect part of the debt. Sherlie Ann was not there, but Neil let him in. Neil told him his sister was home. The defendant looked for Sherlie Ann, but could not find her; so he waited for her in her room. No one was in the room when he entered; he turned on the light; sat on the bed; and turned on the television. He did not see S.R. in the bedroom. Sherlie Ann returned home about 20 minutes later, and they argued about the money. Finally, conceding the loss of the money, the defendant left the house.

Before he went to Sherlie Ann's home, he had gone to a "motorcycle set" from 10 p.m. until 4 a.m. At the "set" (party) the defendant smoked marijuana and drank six or seven beers and some wine.

Assistant State's Attorney David Cuomo testified in rebuttal as to the defendant's statements which were contrary to his testimony.

■ The defendant now concedes there is no additional requirement that in a case in which a sex offense is charged the State must, in addition to proving the defendant guilty beyond a reasonable doubt, demonstrate either the evidence is substantially corroborated or the victim's testimony is clear and convincing. (*People v. Westfield* (1990), 207 Ill. App. 3d 772, 566 N.E.2d 392; *People v. Roy* (1990), 201 Ill. App. 3d 166, 558 N.E.2d 1208.) The standard of proof in a sex case is precisely the same as in any other criminal case.

■ We reject the defendant's argument that he was not proved guilty beyond a reasonable doubt. The totality of the evidence establishes a strong case for the prosecution. The testimony of S.R. concerning the occurrence was straightforward and clear. Moreover, it was substantially corroborated by the testimony of her brother and uncle and, most important, by the testimony of Dr. Cruz. (See *People v. Helton* (1990), 195 Ill. App. 3d 410, 552 N.E.2d 398.) In addition, the State established the defendant's flight; and his testimony was impeached by the assistant State's Attorney and Officer Schreiner.

■ ■ We must also disagree with the defendant's alternative contention that the judge erred when he permitted S.R. to testify. The question of a witness' competency is to be determined by the trial judge, and a reviewing court may not disturb such a determination unless it is clear that the trial judge abused his discretion or misapprehended some legal principle. (*People v. Epps* (1986), 143 Ill. App. 3d 636, 493 N.E.2d 378.) The controlling factor in determining a child's competency is the degree of intelligence, not age. (*People v. Ballinger* (1967), 36 Ill. 2d 620, 225 N.E.2d 10.) A child is competent to testify if mature enough to receive correct impressions by the senses; to recollect and narrate intelligently; and to appreciate the moral duty to tell the truth. (*People v. Wolfe* (1988), 176 Ill. App. 3d 299, 531 N.E.2d 152.) The recent trend has been toward an extremely broad standard of competency in which trial courts' decisions permitting very young children to testify have been upheld. See *People v. Daniels* (1987), 164 Ill. App. 3d 1055, 518 N.E.2d 669, citing *In re A.M.C.* (1986), 148 Ill. App. 3d 775, 500 N.E.2d 104.

The defendant emphasizes the fact that S.R. testified on cross-examination that she could not read, print or add numbers, that the assistant State's Attorney told her the questions and answers and that she twice testified that she did not know the difference between the truth and a lie.

Her academic failures are not surprising considering the environment in which she lives and are not necessarily a true gauge of her intelligence. It is understandable that the assistant State's Attorney would spend considerable time in preparing a young girl for the ordeal of cross-examination which proved to be intense and aggressive. Her testimony that she did not know what truth or a lie was came from suggestive questions on cross-examination:

"Q. And when you talked about truth, the answer that you gave was what the lady told you to say, right?

A. Yes.

Q. You don't understand what truth is, do you, Hon?

A. No.

Q. You don't know what a lie is, do you, Hon?

A. No."

On the other hand, her unsuggested testimony on direct examination was as follows:

"Q. Okay [S.R.], do you know the difference between telling the truth and telling a lie?

A. When you make stories up.

Q. Is that when you tell a lie?

A. Yes.

Q. Okay. Now, is it good or bad to tell the truth?

A. Good.

Q. Okay. Is it good or bad to tell a lie?

A. Bad.

Q. S.R., do you know what will happen to you if you told the judge a lie here in court?

A. You go to jail.

Q. Now, is jail a good or a bad place?

A. A bad place.

Q. And are you going to tell the judge the truth or a lie?

A. The truth."

■ It has been often said that the cold black and white of the record is a poor substitute for the personal observation of the fact finder in determining credibility. The same observation is applicable in determining competency. The demeanor and general alertness of the witness and the spontaneity of her answers are all matters which were obvious to the judge but are hidden from us. The deficiencies in her testimony, pointed out by the defendant, are not sufficient for us to substitute our judgment for that of the trial judge who observed the witness.

The defendant has cited only one case in which a reviewing court reversed a trial judge's order upholding competence of a witness, *People v. Sims* (1969), 113 Ill. App. 2d 58, 251 N.E.2d 795. The *Sims* case, however, is not apposite. *Sims* was reversed and remanded for a new trial because the trial judge had not conducted an adequate preliminary inquiry as to competence. (See *People v. Fultz* (1975), 32 Ill. App. 3d 317, 336 N.E.2d 288; *People v. Brown* (1973), 11 Ill. App. 3d 67, 296 N.E.2d 77.) In this case the judge conducted a thorough hearing.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

RAKOWSKI, P.J., and LaPORTA, J., concur.