THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NICOLE HARRIS, Defendant-Appellant.

First District (5th Division)   No. 1—06—3086

Opinion filed March 13, 2009.

TULLY, J., dissenting.

Robert R. Stauffer, Sarah Hardgrove-Koleno, Jeffrey S. Eberhard, and Shannon P. Bartlett, all of Jenner & Block LLP, and Steven A. Drizin and Alison R. Flaum, both of Center on Wrongful Convictions, Bluhm Legal Clinic, Northwestern University School of Law, both of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald and Peter Fischer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE TOOMIN delivered the opinion of the court:
Following a jury trial, defendant Nicole Harris was found guilty of

first degree murder of her four-year-old son and sentenced to a term of 30 years' imprisonment. On appeal, she asserts that: (1) the trial court erred in denying her motion to suppress statements; (2) the court abused its discretion in finding a key defense witness incompetent to testify; (3) in the absence of proof of the *corpus delicti*, the evidence was insufficient to prove guilt beyond a reasonable doubt; and (4) she was denied effective assistance of counsel. For the following reasons, we affirm.

## BACKGROUND

The instant prosecution stemmed from the strangulation of defendant's four-year-old son, Jaquari Dancy. In the afternoon of May 14, 2005, his father, Sta-Von Dancy, discovered Jaquari's lifeless body on the floor of his bedroom. An elastic cord or band dangling from a fitted sheet on the top bunk was wrapped repeatedly around Jaquari's neck. Sta-Von unwrapped the band and began mouth-to-mouth resuscitation. When Jaquari failed to respond, Sta-Von picked him up and ran outside. He encountered defendant, who had returned from the laundromat and was parking her car. They rushed off in search of a hospital, with defendant driving and Sta-Von continuing his CPR efforts. An ambulance eventually met them and Jaquari was taken to Resurrection Hospital on the Northwest side of Chicago, where he was pronounced dead.

### The Initial Investigation

In the evening of May 14, Chicago police officers were summoned to Resurrection to begin their investigation into Jaquari's death. Detective Randall Wo met with defendant and Sta-Von in a family room about 7:15 p.m. and after expressing sympathies had a brief conversation with the parents. Wo testified that it was customary in child death investigations to ask parents to assist in the investigation and both Sta-Von and Nicole agreed to come to the station. Although defendant was given the option of driving her own car to Area 5 headquarters, she was too emotional and instead elected to ride in a police car. The parents arrived at the station between 8 and 9 p.m.

Detective Anthony Noradin was among the team of officers assigned to the death investigation. Initially, he was basically told that "there was a four-year-old child they found with an elastic band wrapped around his neck." There was no indication that this was a murder investigation. Detective Noradin and his partner, Detective Kelly, interviewed defendant at 9 p.m. in the "quiet room," a sensitive room used mainly for victims of sexual assaults. The room is approximately 18 by 12 feet, with a table and chairs, a television, telephone and a computer. Defendant was not restrained; her five-

year-old son Diante was seated on her lap. The detectives asked questions concerning background information as well as the family's activities during the day. Her responses gave the officers no reason to believe that Jaquari's death was the result of anything but an accident. Following this 25- to 30-minute conversation, the detectives left defendant and Diante in the room with the door open. Defendant was not told she was under arrest nor was she told that she was free to leave. The detectives passed the results of their conversation to other detectives who were about to interview Sta-Von. It is customary interviewing practice to separate witnesses during investigations.

### Defendant's Arrest and Custodial Interrogation[1]

As the investigation continued, Detectives Balodimas and Landando left the station to re-canvas the family's apartment building at 2004 North LaPorte in Chicago. After speaking with other tenants, they returned to the station to confront defendant with some of the inconsistencies between her earlier comments and what they had learned from her neighbors. Detective Balodimas told defendant that contrary to her earlier statement, the neighbors said that she had struck her children that day with a belt, rather than with her hands. They spoke for about 15 minutes and toward the end of the conversation, defendant told the officers that when she returned from the laundromat, she got mad when she saw Jaquari and Diante outside. She then broke down, started crying, and spontaneously stated, "I wrapped the phone cord around Jaquari's neck and then I wrapped the elastic band from the bed sheet around his neck to make it look like an accident." Detective Landando immediately stopped the questioning and read defendant her *Miranda* rights from his Fraternal Order of Police book. According to Noradin, defendant acknowledged them, saying: "I understand my rights. I have a degree from Southern University of Illinois. I understand my rights." She was then placed under arrest and moved to Interview Room A, a secure room. Although the room has a metal bench and handcuff bar, defendant was not restrained. The questioning did not resume at this time.

At 1:40 a.m., Noradin and Kelly returned to the interview room and again spoke with defendant. Noradin informed her that an assistant State's Attorney would be coming out to memorialize her statement. In turn, defendant recanted, denying that she caused Jaquari's death. The conversation lasted but five minutes.

---

[1]What transpired next is the subject of conflicting testimony. We will proceed first with the State's evidence followed by the defendant's version offered at trial.

The detectives next spoke to defendant at about 2:25 a.m. at which time she agreed to take a polygraph examination. Arrangements were made to do the examination later that morning. At 11:30 a.m., Noradin took defendant to the polygraph section located at 1819 West Pershing Road. Sta-Von was taken there in another car having likewise agreed to the examination. Investigator Bartik, the polygraph examiner, first spoke to the detectives concerning the facts of the case. He met with defendant at 12:45 p.m., at which time she signed the polygraph consent, which included her *Miranda* waiver. At no time did she elect to remain silent or request an attorney. The examination took about an hour and a half and defendant answered the questions coherently. Although Bartik could not determine whether defendant was telling the truth, he informed the detectives that she had made certain statements that were inconsistent with earlier accounts as well as information provided by Sta-Von. In turn, the detectives reinterviewed defendant at the polygraph section and were then told that after defendant took Jaquari back into the bedroom, she spanked him again, grabbed the elastic band from the top bed sheet, put it around his neck, laid him on the top bunk and then left.

Defendant was returned to Area 5 and again placed in the "quiet room." At 7:10 p.m., she again spoke with Balodimas, Landando and Noradin. After being reminded of her rights, defendant was confronted with the fact that because there was a bed rail around the bunk, there was no way Jaquari could have rolled off the bed and fallen to the floor. The defendant then stated she wanted to tell the truth; that she wrapped the elastic band around Jaquari's neck three to four times and pulled it until he stopped crying. She saw blood coming from his nose, laid him down and then left. In turn, Noradin called the State's Attorney's office and asked for a felony review assistant to come to the station.

Assistant State's Attorney Lawrence O'Reilly had been summoned earlier to Area 5 on another investigation. Because the detectives on that matter did not need him immediately, he agreed to help with this case. O'Reilly, together with Detectives Noradin and Cordero, met with defendant around 8:30 p.m. in the "quiet room," which O'Reilly described as an office, a yellow room "with butterflies and ladybugs and things" painted on the wall. After introducing himself and making it clear that he was an assistant State's Attorney and not defendant's lawyer, O'Reilly *"Mirandized"* the defendant. She acknowledged her understanding and agreed to tell him what had happened to Jaquari.

According to defendant, on the prior day, she and Sta-Von left for the laundromat late in the afternoon, instructing both children to

remain inside. They spent 30 to 40 minutes there and on returning home found Jaquari outside with older boys, kids who were 7 and 8. She took Jaquari to his bedroom, pulled down his pants and spanked him with a belt. She spanked her other son too and left both children in the bedroom. Jaquari would not stop crying so defendant told him: "There's nothing wrong with you. Stop crying." The crying continued. She reentered the children's bedroom and grabbed the elastic portion of the fitted sheet from the top bunk and wrapped it around Jaquari a number of times. He had a little bit of blood coming from his nose and eventually he stopped crying and squirming. She left Jaquari in the bed with the elastic band around him. Her boyfriend was asleep in their bedroom and defendant then went back to the laundromat to finish her laundry. She returned about 30 minutes later, and after double parking in front of the house, brought the laundry to the door and rang the bell. Her boyfriend responded and took the laundry and defendant went back to park the car. When she returned, the boyfriend was holding Jaquari, who was discolored and not breathing. They then got into the car and started to the hospital, calling 911 en route.

Toward the end of the interview, and out of the presence of any police officers, O'Reilly asked defendant how she had been treated by the police. In response, defendant stated that she had been treated well. He then explained various ways to memorialize her statement and defendant agreed to do a videotaped statement. O'Reilly then left to make arrangements and secure the consents and paperwork. As he walked out he was met by Andrea Grogan, the felony review assistant who had actually been called on Jaquari's death investigation. He turned the case over to Ms. Grogan and returned to the investigation to which he had originally been assigned.

Assistant State's Attorney Grogan interviewed defendant at 9:20 p.m. in the "quiet room" with Noradin, Balodimas and Cordero. After explaining her role as an assistant State's Attorney, Grogan advised defendant of her *Miranda* rights, which defendant acknowledged. They then spoke for about 40 minutes, and toward the end of the interview, the detectives were asked to leave the room. In response to Grogan's inquiries, defendant then told her that she had not been forced or threatened to speak, that she had been treated fine by the detectives, provided food and drink and allowed to use the bathroom. In a second conversation at about 11:45 p.m., defendant chose to give a videotaped statement and appropriate arrangements were made. The statement was actually videotaped at 1:06 a.m. on May 16, and lasted about 20 minutes. The videotape, together with its transcription were admitted during the trial and were likewise reviewed by this court.

In the pretrial proceedings, defendant filed a motion to suppress statements wherein she alleged *inter alia* that she was never given her *Miranda* warnings, that she was incapable of understanding them and that she was subjected to physical and mental coercion. Responding to those allegations, all of the police personnel and assistant State's Attorneys involved in the investigation testified that defendant was duly admonished of her rights, acknowledged her understanding and agreed to waive them. Likewise, all of the officers denied any physical or mental coercion, specifically, that defendant had been shoved, poked or handcuffed to a wall, berated or called names, made promises or subjected to any threats. Further, the witnesses testified that defendant was provided food, drink, and water and allowed to use the bathroom. She made no complaints about her treatment during the course of the investigation.

The defendant offered no evidence on the motion, choosing to reserve her challenges to the statements for presentation before the jury. In turn, the motion to suppress was denied.

## The Trial Proceedings

At trial, the State introduced the evidence previously recounted encompassing the initial investigation, defendant's arrest and custodial interrogation. Assistant State's Attorneys Grogan and O'Reilly also related their involvement in the investigation, and the videotape of defendant's confession was introduced and published before the jury.

Additionally, the State presented Sta-Von Dancy whose testimony focused on the events of the tragic day, culminating in his discovery of Jaquari's lifeless body. Sta-Von testified that as he approached Jaquari, he saw that his face was purple. He observed elastic wrapped tightly on his neck, close to 10 times, and succeeded in unwrapping it before taking Jaquari in his arms. Sta-Von had seen the elastic before, hanging from the sheet on the top bunk reaching almost to the bottom bed. Jaquari had played with the sheet before, wrapping it around his neck.

The prosecution also offered testimony from Assistant Cook County Medical Examiner John Scott Denton, who conducted the postmortem examination of Jaquari. Dr. Denton had performed 2,000 to 2,500 autopsies of which 30 were strangulation cases. Among Denton's significant findings were petechiae or pinpoint hemorrhages in both eyes, indicative of increased pressure around the neck. There were also impression or ligature marks on Jaquari's neck, most prominent on the left side and somewhat fainter on the right. Dr. Denton testified that a ligature causes arterial pressure to rise, but prevents the blood from returning back down. As a result, the head

becomes very congested, causing blood vessels to burst. Accompanying the body was a blue fitted sheet with a protruding elastic cord. The cord was consistent with and completely covered the ligature mark, an exact fit to its horizontal and vertical ridges. Although Denton was also provided a telephone cord, it did not have the horizontal marks consistent with the elastic band.

Dr. Denton formed two opinions relative to cause and manner of death. The first opinion was formed during the autopsy on May 15:

> "My opinion at the time was that this was a tragic accident, that this was a boy who was in his upper bunk bed who had become entangled with an elastic bed fitted sheet and had fallen to the ground from his upper bunk and that this was just a tragic accident that occurred and it was a hanging."

Several days later, a detective informed the doctor of defendant's confession. In turn, Denton was provided with the confession, detective reports and scene photographs of the room and the bunk bed. Initially, he had understood that Jaquari had been in the top bunk, but later learned that Jaquari was actually in the bottom bed. Scene photographs also depicted what appeared to be a small amount of blood on the sheets of the lower bunk. He also learned that the defendant had struck Jaquari with a belt the afternoon of his death. Based on that information, Dr. Denton issued a new opinion concluding that the cause of death was strangulation due to elastic ligature; it was an intentional injury and, therefore, homicide.

The State then rested, and following the denial of defendant's motion for a directed verdict, the defense offered evidence comporting with its theory that the cause of Jaquari's death was accidental strangulation. Consistent with that defense, defendant challenged the foundation and veracity of her confession, asserting that it was falsely contrived and forced upon her by police threats and promises.

At trial, several family members offered testimony supporting the defense theory of accidental death. Defendant's cousin, Wanda Harris, described Diante as inquisitive and Jaquari as playful. The boys would spend weekends with her playing video games and pretending to be superheroes. They were constantly flipping each other and jumping up and down on the couch. However, she never saw Jaquari wearing a cape or anything like that when they were playing superheroes. Sta-Von testified that the boys acted out things they had seen in Spiderman movies. Also, as noted, he had earlier seen the elastic protruding from the top sheet in the boy's bedroom. Jaquari had played with the sheet before, wrapping it around his neck. Defendant's sister-in-law, Audrey Harris, also testified that when the boys played at her house, Jaquari "would be into things." On one occasion, she had left a

laundry bag hanging in her car and when she looked up, Jaquari "had that thing all over his face." Additionally, the defense sought to offer the testimony of five-year-old Diante, that while the boys were alone in their bedroom on the afternoon of the occurrence, he was playing his videogame, and Jaquari was "playing with that string and wrapping it around his neck." However, following a hearing, the court found that Diante was incompetent to testify in accordance with section 115—14 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115—14 (West 2004)).

Defendant testified that she was 23 years old and had graduated from Southern Illinois University with a bachelor's degree in psychology. She recently began working as a psychiatric rehabilitation service coordinator at Winston Manor Nursing Home, doing group assessments with mentally ill patients. The family, which included Sta-Von, herself, Diante and Jaquari, had just moved into the LaPorte Street apartment. The apartment consisted of two bedrooms, a front room and a kitchen. The boys shared one of the bedrooms, which contained a bunk bed, dresser and a television set.

Defendant related that in the afternoon of May 14, she washed her clothes in the laundromat across the street. While the clothes were drying, she returned home and discovered Diante in the hallway. The back door was open and Jaquari was outside. She scolded the children for being out of the house without permission and ordered them to their room. Jaquari was crying, but after Sta-Von went into the bedroom to comfort him, the crying stopped. When he returned, Sta-Von fell asleep on the couch until defendant woke him and helped him to their bedroom, where he again fell asleep.

Defendant then went back to the laundromat and, after gathering the clothes, returned home. She rang the doorbell for Sta-Von to take the clothes while she parked the car. As defendant was parking, Sta-Von came running out with Jaquari in his hands and she asked what had happened. Sta-Von said he did not know and to just get to the hospital. As defendant drove, Sta-Von was giving mouth-to-mouth resuscitation. Eventually, an ambulance met them and took Jaquari to the hospital. Before joining him, they returned home to pick up Diante.

Upon arriving at the hospital, defendant and Sta-Von were told that Jaquari was dead. They were then taken to the chapel, where they met with the doctor, a grief counselor and several detectives. After about an hour, a detective asked them to come to the station for questioning, saying that it was procedure because this was not a natural death. Although the police offered to let defendant drive her own car, she declined because she was too emotional to drive and instead rode with Diante in a police car.

When they arrived at the station, defendant and Diante were escorted to a room that had a desk, chairs, a cabinet and computer. Detectives were in and out asking her questions about when she got up, whether she washed her clothes and other activities of the day. Initially, the police treated her "okay" and she continued cooperating with them. At some point they left, leaving defendant and Diante in the room.

After several hours passed, a man from the Illinois Department of Children and Family Services named Scott Peterson came and asked if there was anywhere for Diante to go. Defendant told him that Diante could go to his grandmother's home and then signed papers giving temporary guardianship to the grandmother, Patricia Dancy. As Diante was leaving, Detective Noradin removed defendant from the initial interview room to another room with a steel bench and a bar over it. Noradin shoved her into the room and "he was, like, you're under arrest for murdering your f'g son." He handcuffed defendant to the bar, telling her "I'm sick of your BS lies, you are sitting here playing games with us, you can't sit here and say you didn't do it because we already found the cord." Defendant started crying and said she was telling the truth. She asked for an attorney, but was told she did not need one, she needed to cooperate. The detectives remained in the room with her for about 20 minutes. They then removed the handcuffs and left. In turn, another detective arrived and told defendant to tell the truth; he said that he had talked to Sta-Von, who thought it was possible that defendant had done it.

Later, the detectives returned and asked defendant if she would be willing to take a lie detector test and she agreed. The test was scheduled for the morning and defendant remained in the interrogation room, leaving only once to use the bathroom. Although she had a blanket with her, defendant was unable to sleep. Noradin took her to the polygraph place, where Detective Bartik provided a consent form for her to sign and then gave the examination. When it was over, Bartik began to ask questions and repeatedly accused her of lying. According to defendant, Bartik told her, "You know what, Nicole, you are pissing me off. I've been very patient with you and you are still sitting up here, you are lying to us, you know what, you're acting like a monster." Defendant said she wanted an attorney because she was telling the truth. Another detective threatened to "turn this stuff over to the state" and Bartik warned that she would "spend the rest of your life behind bars because you won't cooperate."

Bartik continued asking what happened and how many times she wrapped the string around Jaquari's neck. Defendant continued shaking her head and crying and then she said, "I was, like one time," at

which point Bartik left the room. He returned and told defendant that Sta-Von said he found the string wrapped around Jaquari's neck four or five times. Bartik then produced a picture of the children's bunk bed and asked defendant how she did it. She said that she continued shaking her head, "And then I started agreeing."

Defendant testified that Noradin then took her back to the station, where a detective named "Bobby" arranged for her to talk with an assistant State's Attorney and rehearsed the police version of events that she should tell the prosecutor. The detective urged her to "do the videotape because it shows lots of emotion and you are very upset, they need to see that you're upset." "Bobby" assured her that because defendant was cooperating, she would be charged with something like voluntary manslaughter, rather than murder. Detective Noradin also joined in telling defendant that "even if you had to go to jail for a minute, bond won't be that high; your parents could come get you out, and you can fight it from the outside."

When Assistant State's Attorney O'Reilly entered the room with Noradin and "Bobby," defendant provided the rendition of events she had rehearsed. At one point the detectives were asked to leave the room and defendant told the prosecutor that she "had been shoved and stuff," but not by "Bobby," and the attorney took note of it. She also told this to the female assistant State's Attorney who videotaped her statement.

As she concluded her testimony, defendant recalled that the blue sheet on Diante's bed was ripped, but the elastic that was hanging out was still attached. She denied wrapping anything around Jaquari's neck, telling the jury that she gave the statement:

"Because I was scared, and they told me I would be able to go home; and that I wasn't cooperating, and if I didn't cooperate with them, that they were going to turn the stuff over to the state and the state was going to slam my ... ass."

On rebuttal, Detective Landando acknowledged that the secure room to which defendant was taken upon her arrest had a metal bench with a hook on the wall; however, defendant was not handcuffed. Detective Cordero, "Bobby," likewise testified and denied rehearsing defendant's videotaped statement or telling her she could go home if she cooperated with the police. Additionally, Assistant State's Attorney O'Reilly denied that defendant ever told him that she had been pushed, poked or in any way mistreated by the police. Similarly, Assistant State's Attorney Grogan denied that defendant told her she had been poked by any detectives. According to both Grogan and O'Reilley, had that happened, the accusation would have been investigated.

On the fourth day of trial, following closing argument, the jury retired to deliberate. The defense proved unavailing. The jurors arrived at a guilty verdict after 2 hours and 20 minutes of deliberation, presumably including lunch. Thereafter, motions for new trial were filed by the defendant *pro se,* her trial attorneys, and substitute counsel who appeared for posttrial proceedings. All motions eventually were denied and defendant was sentenced to a term of 30 years' imprisonment. The present appeal follows.

## ANALYSIS

### Denial of Defendant's Motion to Suppress Statements

Defendant's suppression motion alleged that her statements were involuntary and that she was not advised of her constitutional rights prior to questioning. The motion encompassed two separate statements; defendant's oral confession on May 15, 2005, at 12:45 a.m., and her videotaped statement recorded the following night. Evidence was received, and at the conclusion of the hearing, the trial court determined by a preponderance of the evidence that both statements were voluntary. Additionally, while recognizing that the first statement was not *"Mirandized,"* the trial court nonetheless concluded that admonishments were not required because the statement was spontaneously offered by the defendant.

On appeal, defendant submits that the initial statement was indeed the product of custodial interrogation and in the absence of *Miranda* admonishments should have been suppressed. Defendant further argues that suppression of the videotaped statement was mandated by *Missouri v. Seibert,* 542 U.S. 600, 159 L. Ed. 2d 643, 124 S. Ct. 2601 (2004), because the "question-first, warn later" tactics employed by the detectives rendered her subsequently administered *Miranda* warnings meaningless. In response, the State asserts that because the defendant was not in custody when she made her spontaneous statement, she was not entitled to *Miranda*'s protections. Even assuming a *Miranda* violation, the State argues that defendant was not thereby disabled from waiving her constitutional rights and confessing after the requisite admonishments were given.

In determining whether a trial court has properly ruled on a motion to suppress, findings of fact and credibility determinations made by the trial judge are accorded great deference and will be reversed only if they are against the manifest weight of the evidence. A court, on review, may also consider trial evidence in determining whether the trial court's decision denying a motion to suppress was correct. *People v. Slater,* 228 Ill. 2d 137, 149, 886 N.E.2d 986, 994 (2008); *People v. Caballero,* 102 Ill. 2d 23, 36, 464 N.E.2d 223, 229 (1984).

However, the ultimate question of whether the evidence should be suppressed is subject to *de novo* review. *People v. Pitman*, 211 Ill. 2d 502, 512, 813 N.E.2d 93, 101 (2004).

The threshold of our inquiry logically begins with *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), where the Supreme Court held:

> "[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. *** He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney[,] one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 478-79, 16 L. Ed. 2d at 726, 86 S. Ct. at 1630.

*Miranda* instructs that the hallmark of custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612. The finding of custody is essential, as *Miranda*'s prophylactic rule was intended to assure that any inculpatory statement made by a defendant is not simply the product of " 'the compulsion inherent in custodial surroundings.' " *Yarborough v. Alvarado*, 541 U.S. 652, 661, 158 L. Ed. 2d 938, 949, 124 S. Ct. 2140, 2147 (2004), quoting *Miranda*, 384 U.S. at 458, 16 L. Ed. 2d at 714, 86 S. Ct. at 1619.

The Supreme Court has recognized that two discrete inquiries impact upon the determination of whether a defendant is "in custody" for *Miranda* purposes. First, " 'what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.' " *People v. Braggs*, 209 Ill. 2d 492, 505-06, 810 N.E.2d 472, 481 (2004), quoting *Thompson v. Keohane*, 516 U.S. 99, 112, 133 L. Ed. 2d 383, 394, 116 S. Ct. 457, 465 (1995).

■ When examining the circumstances of an interrogation, our supreme court in *Slater* identified a number of factors relevant in determining whether a statement was made in a custodial setting, including: (1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the

show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused. *Slater*, 228 Ill. 2d at 150, 810 N.E.2d at 995. After examining and weighing these factors, courts must then make an objective determination as to whether, under the facts presented, "a reasonable person, innocent of any crime," would have believed that he or she could terminate the encounter and was free to leave. *Braggs*, 209 Ill. 2d at 506, 810 N.E.2d at 482. See also *People v. Croom*, 379 Ill. App. 3d 341, 349, 883 N.E.2d 681, 688 (2008).

■ Transposing the relevant factors to the instant case, we first consider the location, length, mode and mood of the questioning. Here, we share in the trial court's observation that at its inception this was a death investigation. Although a four-year-old child tragically had been found with an elastic band wrapped around his neck, there was nothing to suggest that this was not an accidental death; certainly nothing suggesting a homicide. As the trial correctly observed, defendant was not a suspect or target; the detectives were simply attempting to determine the circumstances surrounding Jaquari's death. As parents, defendant and Sta-Von were the logical starting point of that investigation. Given the customary practices of the police, it was reasonable to request that the parents come to the station to assist in the investigation.

We do not perceive any action taken by the detectives suggesting that defendant and Sta-Von were compelled to accompany them. Rather, it is clear from the evidence that the parents concurred in the detectives' request and voluntarily accompanied the officers to Area 5. Here, as in *People v. McKinney*, 277 Ill. App. 3d 889, 894, 661 N.E.2d 408, 411 (1996), there is no indicia of an arrest; certainly no formal declaration or any routine arrest procedures such as the show of force or physical restraint. Moreover, as in *McKinney*, given that the cause of the child's death was still unknown, it is unlikely that any intention to effect an arrest existed. Voluntariness also resonates from the fact the detectives offered the defendant the opportunity to drive her own car to the station. As noted, the defendant rejected the offer because, as she testified, she was too emotional to drive. In turn, she accepted the detective's offer of transportation and, together with her son, was driven to the station by the police.

Contrary to the defendant's argument, upon arrival at the station, defendant was not placed in an "interrogation room" but, rather, in the "quiet room," a sensitive setting with butterflies and ladybugs painted on the wall, used primarily to accommodate victims of sexual assaults. Any room within a police facility might lend itself to question-

ing of witnesses, and although defendant implies that an interrogation room in a police station is inherently coercive, we have found no case holding that the place of the interview, in itself, is dispositive. See *People v. Calhoun*, 382 Ill. App. 3d 1140, 1147, 889 N.E.2d 795, 801 (2008).

Addressing the age, intelligence and mental makeup of the accused, we find significance attaches to defendant's testimony that she was 23 years old, a high-school graduate, and had recently graduated from Southern Illinois University with a bachelor's degree in psychology. She was also gainfully employed in a nursing home as a "Psychiatric Rehabilitation Service Coordinator" making group assessments of mentally ill patients. Although the defendant was visibly upset during her initial meeting with Noradin and Kelly, the trial evidence reflects no mental impairment or intellectual deficiencies. Nor was she subjected to prolonged questioning. Detective Noradin testified that the initial interview at 9 p.m. lasted only 30 minutes. At that time, the detectives were essentially seeking background information concerning Jaquari's death and the defendant was fully cooperating with them. The door was left open after the officers moved on to continue their investigation. Defendant remained in the room with her child, neither handcuffed nor in any way restrained.

Moreover, when the second interview was convened in the "quiet room" over three hours later, defendant's status remained unchanged. Notably, she had earlier chosen to voluntarily accompany the detectives from the hospital and manifested no intention to forego her cooperation, at least up to the point of her spontaneous admission. Thus, given the circumstances surrounding both interviews and considering what a reasonable person would have perceived, we are unable to conclude that defendant was in custody for *Miranda* purposes prior to her arrest. Because defendant's custodial interrogation did not begin until *Miranda* warnings were given, a *Seibert* violation could not have occurred. *Calhoun*, 382 Ill. App. 3d at 1147, 889 N.E.2d at 801.

In making this determination, we are mindful of defendant's argument that because the second questioning directly related to the alleged crime at issue it sufficed to trigger *Miranda*'s protection. Relying upon *Rhode Island v. Innis*, 446 U.S. 291, 303, 64 L. Ed. 2d 297, 309, 100 S. Ct. 1682, 1691 (1980), defendant contends that the detectives should have known that their words or actions were reasonably likely to elicit an incriminating response. However, *Innis* tacitly provides that *Miranda*'s safeguards came into play only where a person is in custody and we have already determined that custody had not as yet attached. Moreover, defendant misconstrues the purpose of

the second interview. Although Detective Noradin candidly acknowledged that Balodimas and Landando entered the room to confront defendant with what they perceived as inconsistencies in her earlier statement, those inconsistencies did not imply a change in status from interested parent to murder suspect or otherwise go to the heart of the investigation. Rather, the inquiry remained a death investigation certainly up to the time of defendant's spontaneous admission.

Even were we to assume that defendant was subjected to custodial interrogation at the inception of the second interview, we are not persuaded that a different result would obtain under *Seibert* or its progeny. In *Seibert*, following a suspect's arrest, the officers made a calculated decision to secure an unwarned incriminating statement and then, after administering *Miranda* admonishments and obtaining a waiver, confronted the suspect with his prewarned statement and obtained additional admissions. *Seibert*, 542 U.S. at 605-06, 159 L. Ed. 2d at 651, 124 S. Ct. at 2606. The *Seibert* plurality reasoned that the employment of this two-step strategy frustrated the intent of *Miranda* because, "Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone to persist in so believing once the police began to lead him over the same ground again." *Seibert*, 542 U.S. at 613, 159 L. Ed. 2d at 655-56, 124 S. Ct. at 2611.

However, earlier, in *Oregon v. Elstad*, 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285 (1985), the Court recognized that suppression of all statements made after police failed to follow *Miranda*'s mandate was not always required. In *Elstad*, following his arrest the defendant was first questioned in his home without the benefit of *Miranda* warnings. After making an incriminating statement, he was taken to the police station and admonished, and after waiving his rights, he made a second inculpatory statement. In considering whether the postwarning statement should have been suppressed, the Supreme Court focused on the difference between consequences flowing from confessions coerced through physical violence as against those freely given in response to an unwarned but noncoercive question. The Court concluded:

> "[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Elstad*, 470 U.S. at 314, 84 L. Ed. 2d at 235, 105 S. Ct. at 1296.

We recognize that in *Seibert*, the Supreme Court replaced the voluntariness test of *Elstad* with a presumptive rule of exclusion where a deliberate two-step interrogation technique was employed. However, as the Seventh Circuit reasoned in *United States v. Steward*, 388 F.3d 1079, 1090 (7th Cir. 2004), where the initial violation of *Miranda* "was not part of a deliberate strategy to undermine the warnings, *Elstad* appears to have survived *Seibert*."

Moving forward, in *People v. Lopez*, 229 Ill. 2d 322, 892 N.E.2d 1047 (2008), the Illinois Supreme Court concurred in the Seventh Circuit's analysis, holding that in applying *Seibert*, courts must first determine whether the detectives deliberately employed a question-first, warn-later strategy when interrogating a defendant. The court concluded:

> "If there is no evidence to support a finding of deliberateness on the part of the detectives, our *Seibert* analysis ends. If there is evidence to support a finding of deliberateness, then we must consider whether curative measures were taken, such as a substantial break in time and circumstances between the statements, such that the defendant would be able 'to distinguish the two contexts and appreciate that the interrogation has taken a new turn.' " *Lopez*, 229 Ill. 2d at 360-61, 892 N.E.2d at 1069, quoting *Seibert*, 542 U.S. at 622, 159 L. Ed. 2d at 661, 124 S. Ct. at 2616 (Kennedy, J., concurring).

Here, as in *People v. Lowenstein*, 378 Ill. App. 3d 984, 993, 883 N.E.2d 690, 697 (2008), we cannot infer that the detectives deliberately employed a two-step strategy to undermine *Miranda* or to evade its requirements. There simply is no evidence that the questioning was " 'systematic, exhaustive and managed with psychological skill.' " *Lowenstein*, 378 Ill. App. 3d at 993, 883 N.E.2d at 697, quoting *Seibert*, 542 U.S. at 616, 159 L. Ed. 2d at 657, 124 S. Ct. at 2612. Instead, the credible and persuasive evidence demonstrates that, during the course of rather routine questioning, the detectives were understandably surprised by defendant's spontaneous admission. After immediately responding by administering the *Miranda* warnings, the detectives appropriately ceased further questioning and placed the defendant under arrest. Post-*Miranda* questioning did not resume until the following afternoon at the polygraph section and later upon defendant's return to Area 5.

In the proceedings below, at the conclusion of the suppression hearing the court found the testimony of the police witnesses Noradin and Bartik to be credible and believable. The trial judge also had the opportunity to review defendant's videotaped confession and observe her demeanor. The court's inquiry properly focused upon whether

defendant's statements were made freely and voluntarily without compulsion or inducement. In denying the motion, the court concluded that although the defendant was duly admonished, at no time did she invoke her constitutional rights. Nor did the court find any credible evidence of physical or psychological coercion or any police misconduct. Although defendant certainly offered contrary evidence at trial, in denying her various posttrial motions, the judge gave no credence to that testimony, instead reaffirming his earlier findings. Based upon the record, we find no cause to disturb that determination. We agree that defendant's motion to suppress was properly denied.

Brief comment should be made on the dissent's conclusion that the evidence, when viewed in its entirety, supports an inference that the detectives engaged in some form of "question first, warn later interrogation." Curiously, in reaching this conclusion, the dissent gives greater credence to the defendant's version of what transpired during the investigation, rather than the determination made by the fact finders in the proceedings below. The dissent's analysis thus fails to accept the function of a reviewing court to give deference to the fact finder's assessment of the evidence:

> "Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979).

See also *People v. Lee*, 209 Ill. 2d 194, 209, 808 N.E.2d 939, 947 (2004).

Contrary to this well-settled guidepost, the dissent chooses to accept the defense version of the evidence. For example, the dissent boldly states that defendant, around 1 a.m., was questioned and confronted by the same detectives that had questioned her earlier and left her in the room. The statement we note is clearly contradicted by the State's evidence showing that it was not the original detectives, Noradin and Kelly, that questioned the defendant at 1 a.m., but rather, a second team consisting of Balodimas and Landando. The dissent also asserts that the detectives felt compelled to continually encourage defendant to modify her statement until they were satisfied it conformed to the evidence. Again, that was the defendant's version of the evidence; the fact finder found otherwise, crediting Detective Cordero's denial of rehearsing defendant's videotaped confession. It is not the function of this court to retry the defendant. *People v. Hall*, 194 Ill. 2d 305, 329-30, 743 N.E.2d 521, 536 (2000).

## Diante's Competency to Testify

Defendant next asserts that the trial court abused its discretion

and violated her constitutional rights when it ruled that Diante Dancy was incompetent to testify as a defense witness. By the court's ruling defendant argues the jury was prevented from hearing that Diante, the sole eyewitness to Jaquari's death, saw his brother wrap a cord around his neck the day he died. Defendant submits that the court misallocated the burden of proof at the competency hearing, based its analysis on factors outside of Illinois statutory law, and made findings unsupported by the record. In response, the State defends the trial court's ruling on three grounds: (1) the court's factual findings are entitled to deference; (2) the incorrect assignment of the burden of proof did not affect the outcome; and (3) the exclusion of Diante's testimony was harmless beyond a reasonable doubt.

Precedent instructs that the question of a witness's competency is to be determined by the trial judge, and a reviewing court may not disturb that determination absent a clear abuse of discretion. *People v. Sutherland*, 317 Ill. App. 3d 1117, 1125, 743 N.E.2d 1007, 1013 (2000). This deference is given because the trial court, unlike the reviewing court, has the opportunity to observe the demeanor, appearance, and conduct of the witness. *People v. Cookson*, 335 Ill. App. 3d 786, 789, 780 N.E.2d 807, 809 (2002).

In the instant case, Diante Dancy had just become six years old at the time he was offered as a defense witness. Nonetheless, irrespective of age, section 115—14 of the Code of Criminal Procedure provides that every person is qualified to testify unless he or she is incapable of: (1) expressing himself concerning the matter so as to be understood, either directly or through interpretation; or (2) understanding the duty of a witness to tell the truth. 725 ILCS 5/115—14 (West 2004).

Defendant submits that the court abused its discretion when the court misallocated the burden of proof in stating that "since it's defense counsel's wish to call Diante as a witness, it will be the defense's burden of establishing his competency in accordance with 725 ILCS 5/115—14." We agree with the defendant that because the party challenging Diante's competency was the State, the court's pronouncement contravened the provisions of the statute mandating that the burden of proving incompetency devolves on the party challenging the witness's ability to testify. 725 ILCS 5/115—14(c) (West 2004).

The parties voiced no objection to the court's directive and the hearing progressed with the defense conducting the direct examination of Diante, followed by examination by the State and the court. Although the trial judge candidly acknowledged his error in denying defendant's motion for new trial, the judge nonetheless stated that he would have found Diante incompetent regardless of which side had

the burden. Defendant argues that the court's statement is suspect in light of the degree to which the judge emphasized the defense failure to satisfy its burden of proof when he announced his original ruling. Thus, defendant boldly claims that the court based its decision on a finding "that the defendant failed to give the court any 'insight into whether or not Diante knows what is the truth and what is a lie or not true.' " Defendant misstates the record as the page designated in the brief makes no reference to the defense failing to provide such insight or for that matter, anything else.

Moreover, we fail to perceive that any prejudice inured to the defense because of the court's procedural error. Clearly, this was not a situation where the burden of proof was outcome determinative. The parties and the court examined Diante, and after weighing the evidence the court made its ruling. Thus, we attach little significance to this claim of error.

We next address defendant's argument that the trial court based its analysis on factors outside Illinois statutory law. We observe from the record that at the inception of its findings, the court referenced the controlling statute, namely, section 115—14 of the Code of Criminal Procedure (725 ILCS 5/115—14 (West 2004)), paraphrasing its requirement:

"A person is disqualified to be a witness if he is incapable of expressing himself or herself concerning the matter, either directly or through interpretation by one who can understand or is incapable of understanding the duty that the witness has to tell the truth."

Additionally, the court recited the criteria set forth in *People v. Puhl*, 211 Ill. App. 3d 457, 466, 570 N.E.2d 447, 452 (1991), directing trial courts to consider: "(1) the ability of the witness to receive correct impressions from [his] senses; (2) the ability to recollect these impressions; (3) the ability to understand questions and express answers; and (4) the ability to appreciate the moral duty to tell the truth."

Defendant argues that the *Puhl* decision was based on a competency test established by the Illinois Supreme Court prior to the enactment of section 115—14. Those factors, it is claimed, are more rigid and extensive than those required by the statute and cannot be a basis for upholding the trial court's decision. We discern that defendant's argument elevates form over substance as the factors set forth in *Puhl* are synonymous with the statutory requirement that the witness be capable of expressing himself in a manner in which he can be understood and be capable of understanding the duty to tell the truth. 725 ILCS 5/115—14 (West 2004). Moreover, we find it ironic that defendant's argument significantly relies upon *Sutherland*, a decision

that includes within the rubric of competency the nonstatutory factor of a child's ability to distinguish between fantasy and reality. *Sutherland*, 317 Ill. App. 3d at 1125, 743 N.E.2d at 1013-14. Therefore, we find little merit to this claim.

Defendant further submits that the trial court's findings are unsupported by the record. Addressing this argument we note that in its determination of incompetence the court found that Diante did not satisfy the first requirement of the statute because he lacked the ability to recall the events of the date in question and to be able to communicate them effectively in court. At the hearing, Diante recalled that the last time he was at his old house he was in his bedroom with Jaquari. He was playing a spider game. "Jaquari was playing with that string and wrapping it around his neck." The string was on a blue sheet and nobody else was around. He did not remember the date but it was the time "when my mom and dad picked Jaquari up and me in the house." Diante also remembered talking to Karen Wilson, a child protection investigator. He did not tell her that Jaquari wrapped the elastic band around his neck. He told her that he was asleep when his brother got hurt.

In response to the court's inquiry, the following colloquy occurred:

"Q. Diante, you tolled [*sic*] me you remember playing Spiderman in your bedroom with your brother, is that right?

A. Yes.

Q. Do you remember anything else that happened that day?

A. No.

Q. Nothing at all?

A. No."

In summarizing Diante's ability to perceive and relate events, the court stated that it had considerable question as to that issue:

"He's indicated that the only thing that he recalls is playing Spiderman with his brother, the aspect with the cord and the neck, but he remembers nothing else at all from that day."

Although defendant faults the court's determination asserting that Diante remembered many key details about the events of the day, defendant's argument ignores the obvious—the court's comment was simply a summary; key details were not required.

Defendant also challenges the trial court's finding that Diante lacked the understanding and acceptance of his duty to testify truthfully in the case. Here, the sole answer given by Diante demonstrating the difference between the truth and a lie was: "Telling a lie, you might get in trouble. Telling the truth, you might get a star." Yet, the trial judge was troubled by Diante's denial that he had spoken with any of the lawyers before coming to court, when the judge had been

apprised that the prosecutor and defense counsel had met with him earlier. Additionally, Diante related that Spiderman was real and that he had seen him in person, that he had seen Jaquari, his other brother Junior, and his cousin in heaven, and that Jaquari said "my mommy killed my brother, and my mommy didn't." Based upon Diante's responses, the court had legitimate concerns as to Diante's ability to differentiate between truthfulness and falsehood.

It has often been said that the cold black and white of the record is a poor substitute for the personal observations of the fact finder in determining credibility, and the same is equally true for competency. *People v. Mack*, 216 Ill. App. 3d 239, 246, 576 N.E.2d 1023, 1027-28 (1991). The demeanor of the witness, while apparent to the trial court, is hidden from a court of review. *People v. Dempsey*, 242 Ill. App. 3d 568, 584, 610 N.E.2d 208, 218 (1993). In the instant case, the court's appraisal of Diante was not based solely upon the answers he provided, but also took into account his demeanor, his delay in answering questions as well as his uncertainty in formulating responses. Given all of these considerations, we cannot conclude that the court's determination of incompetency is unsupported by the record.

Finally, the State argues that even assuming the trial court erred in finding Diante to be an incompetent witness, any error in excluding his testimony was harmless beyond a reasonable doubt. We agree. See *Washington v. Recuenco*, 548 U.S. 212, 218-19, 165 L. Ed. 2d 466, 474, 126 S. Ct. 2546, 2551 (2006) (an error is amenable to harmless error analysis except where the error is "structural" in nature in that it necessarily renders a criminal trial unfair or an unreliable vehicle for determining guilt or innocence). Here, we discern that the evidence in this case, based essentially upon a detailed and corroborated videotaped confession, was indeed overwhelming. See *Elstad*, 470 U.S. at 312, 84 L. Ed. 2d at 234, 105 S. Ct. at 1294-95 (recognizing a voluntary confession as highly probative evidence).

We likewise reject the viewpoint that the proposed testimony of Diante was likely to have any significant impact upon the strength of the State's case. The inherent weakness in the Diante proffer was confirmed at the hearing and shown to have a minimal basis in fact. At best, the defense might have placed before the jury Diante's observation of Jaquari wrapping an elastic band around his neck. However, the jurors had learned from other witnesses that Jaquari had done such things before. Moreover, the proposed testimony likely would have been negated or otherwise diminished by Diante's admission to Ms. Wilson the day following the murder, that "he was asleep when his brother got hurt." That admission of course was corroborated by Sta-Von's testimony that Diante indeed was asleep when he

discovered Jaquari's lifeless body on the bedroom floor. If the court's determination was conceivably error, it was harmless beyond a reasonable doubt.

## Sufficiency of the Evidence

■ The defense submits that under the rule of *corpus delicti* the evidence presented at trial was insufficient to establish defendant's guilt beyond a reasonable doubt. Notwithstanding defendant's detailed confession, the defense argues that the absence of independent evidence tending to show the commission of a crime undermines her conviction.

It is of course an abiding principle that where a conviction is based on a confession, it is axiomatic that the confession be corroborated. *People v. Willingham*, 89 Ill. 2d 352, 358-59, 432 N.E.2d 861, 864 (1982). As defendant correctly notes, the corroboration requirement stems from a historical mistrust of extrajudicial confessions: (1) that confessions are unreliable, if coerced; and (2) for various psychological reasons, persons "confess" to crimes that either have never occurred or for which they are not legally responsible. *People v. Dalton*, 91 Ill. 2d 22, 29, 434 N.E.2d 1127, 1131 (1982).

In Illinois, the corroboration requirement is satisfied by the *corpus delicti* rule, which requires proof of injury or loss coupled with proof of criminal agency. *People v. Lambert*, 104 Ill. 2d 375, 378, 472 N.E.2d 427, 428 (1984). See also E. Cleary, McCormick on Evidence §158, at 347 (2d ed. 1972). The State's independent evidence need not rise to the level of proof beyond a reasonable doubt, but must only tend to confirm a defendant's confession. *People v. Cloutier*, 156 Ill. 2d 483, 503, 622 N.E.2d 774, 784 (1993). As our supreme court noted in *People v. Perfecto*, 26 Ill. 2d 228, 229, 186 N.E.2d 258, 258-59 (1962), the *corpus delicti* is not required to be proved beyond a reasonable doubt exclusively by evidence aliunde the confession. Rather:

> " 'If there is evidence of corroborating circumstances which tend to prove the *corpus delicti* and correspond with the circumstances related in the confession, both the circumstances and the confession may be considered in determining whether the *corpus delicti* is sufficiently proved in a given case.' " *Perfecto*, 26 Ill. 2d at 229, 186 N.E.2d at 259, quoting *People v. Borrelli*, 392 Ill. 481, 493 (1946).

Nor is there any requirement that the independent evidence and details of the confession correspond in every particular. *People v. Furby*, 138 Ill. 2d 434, 451, 563 N.E.2d 421, 428 (1990). The independent evidence need only tend to inspire belief in defendant's confession or statement. *People v. Curry*, 296 Ill. App. 3d 559, 565, 694 N.E.2d 630, 636 (1998).

In support of its argument, the defense relies upon *People v. Lueder*, 3 Ill. 2d 487, 488, 121 N.E.2d 743, 744 (1954), wherein an arson conviction was reversed for failure to prove the *corpus delicti*. In *Lueder*, although the defendant confessed to burning down a tool shop in the cemetery, the sole evidence independent of the confession consisted of the burned building and the fact that defendant was employed by the cemetery. Absent the confession, there was no evidence that any person wilfully torched the structure. However, in the instant case, the independent evidence not only established Jaquari's death, but also provided a cause of death that tended to corroborate the details of defendant's confession. Defendant also places reliance on *People v. Ehlert*, 211 Ill. 2d 192, 811 N.E.2d 620 (2004), a case that is clearly distinguished from the facts at bar. In *Ehlert*, there was no confession, but more importantly, the decision did not rest upon the State's failure to satisfy the *corpus delicti* rule. Rather, the court's construct focused upon an additional requirement, that where the State alleges that defendant killed her newborn, it must prove that the infant was born alive. That proof was found to be lacking. *Ehlert*, 211 Ill. 2d at 209-10, 811 N.E.2d at 630.

In the instant case, we find that the independent evidence did indeed tend to inspire belief in defendant's confession. First, although Dr. Denton initially believed that Jaquari's strangulation resulted from an accidental hanging, additional evidence led him to change his opinion to an intentional killing or homicide. Denton earlier had been led to understand that Jaquari had fallen from the top bunk and become entangled in the elastic band. However, new evidence established that Jaquari slept on the bottom bed. Dr. Denton also learned that Jaquari had been physically punished by his mother, struck with a belt and sent to his room.

In our opinion, the significance of these revelations cannot be overlooked or underestimated. The initial understanding of Dr. Denton that Jaquari fell from the top bed did not come from Sta-Von, for he unequivocally told the police that when he discovered Jaquari, his brother Diante was asleep on the top bunk. The genesis for the earlier version was the defendant and she persisted in that story until confronted with the detectives' discovery that the guardrail would have prevented Jaquari from falling from the top bunk, if indeed he had been there. Although defendant's story then changed, her original version may well be viewed as a false exculpatory statement having an independent value as evidence of consciousness of guilt. *People v. Milka*, 211 Ill. 2d 150, 181, 810 N.E.2d 33, 51 (2004); *People v. Muhammad*, 257 Ill. App. 3d 359, 368, 629 N.E.2d 106, 113 (1993); *People v. Houseton*, 141 Ill. App. 3d 987, 994, 490 N.E.2d 1354, 1360 (1986).

See also R. Ruebner, Illinois Criminal Trial Evidence §5(E)(3), at 234 (4th ed. 2001). That evidence tends to inspire belief in defendant's candid acknowledgment of guilt. For these reasons we find the *corpus delicti* has indeed been proved aliunde the confession and reject defendant's claim.

## Ineffective Assistance of Counsel

■ Defendant also contends that she was denied her right to effective assistance of counsel when her attorneys: (1) failed to argue that the competency hearing was procedurally flawed, did not adequately prepare Diante to testify or otherwise present corroborative and expert testimony supporting a finding of competency; (2) failed to present expert testimony on accidental strangulation and false confessions; and (3) improvidently withdrew her meritorious motion to quash arrest and suppress evidence. Defendant also argues her right to effective assistance was abridged by other cumulative, but unspecified, errors.

The question of whether defense counsel provided ineffective assistance requires a bifurcated standard of review, wherein we defer to the trial court's findings of fact unless they are against the manifest weight of the evidence, but make a *de novo* assessment of the ultimate legal issue of whether counsel's actions support an ineffective assistance claim. *People v. Berrier*, 362 Ill. App. 3d 1153, 1166-67, 841 N.E.2d 1117, 1128-29 (2006); *People v. Davis*, 353 Ill. App. 3d 790, 794, 819 N.E.2d 1195, 1200 (2004). Because the facts surrounding defendant's claim here are undisputed, our review is *de novo*. *Berrier*, 362 Ill. App. 3d at 1167, 841 N.E.2d at 1128-29.

To prevail on a claim of ineffective assistance a defendant must establish: (1) the attorney's performance fell below an objective standard of reasonableness, and (2) this deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984); *People v. Albanese*, 104 Ill. 2d 504, 526, 473 N.E.2d 1246, 1255 (1984). A defendant's failure to satisfy either prong of the *Strickland* test defeats a claim of ineffectiveness. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; *People v. Morgan*, 187 Ill. 2d 506, 529-30, 719 N.E.2d 681, 698 (1999).

When reviewing an attorney's performance, this court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065, quot-

ing *Michel v. Louisiana*, 350 U.S. 91, 101, 100 L. Ed. 83, 93, 76 S. Ct. 158, 164 (1955). "Generally, matters of trial strategy will not support a claim of ineffective assistance of counsel unless counsel failed to conduct any meaningful adversarial testing." *People v. Patterson*, 217 Ill. 2d 407, 441, 841 N.E.2d 889, 910 (2005).

Further, counsel's strategic decisions will not be second-guessed. Indeed, to ruminate over the wisdom of counsel's advice is precisely the kind of retrospection proscribed by *Strickland* and its progeny. See *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065 ("[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"); see also *People v. Fuller*, 205 Ill. 2d 308, 330-31, 793 N.E.2d 526, 541-42 (2002) (issues of trial strategy must be viewed, not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions). Moreover, "the fact that another attorney might have pursued a different strategy is not a factor in the competency determination." *People v. Palmer*, 162 Ill. 2d 465, 476, 643 N.E.2d 797, 802 (1994), citing *People v. Hillenbrand*, 121 Ill. 2d 537, 548, 521 N.E.2d 900, 904 (1988).

To show prejudice "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *People v. Erickson*, 183 Ill. 2d 213, 224, 700 N.E.2d 1027, 1032 (1998). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

A court need not consider whether counsel's performance was deficient prior to examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069. Where ineffectiveness can be disposed of on the ground that the defendant did not suffer sufficient prejudice, the court need not determine whether counsel's performance constituted less than reasonably effective assistance. *People v. Flores*, 153 Ill. 2d 264, 283-84, 606 N.E.2d 1078, 1087 (1992).

Addressing first the competency hearing arguments, defendant faults trial counsel for failing to challenge the trial court's improper placement of the burden of proof on the defense and failing to adequately prepare Diante to testify. Yet, as the trial judge noted in denying defendant's posttrial motions, his ruling would have been the same had the burden been properly placed. Also, the record reflects that defense counsel as well as the prosecutor spoke with Diante before he testified and counsel makes no showing that a different result

would have obtained had there been more extensive preparation. We likewise find it ironic that defendant posits this claim of inadequate preparation given her earlier argument that Diante's testimony at the hearing was sufficient to establish his competency. Accordingly, defendant suffered no prejudice because of counsel's purported deficiencies.

Defendant next claims counsel was ineffective for failing to present the testimony of Ale Levy and a child psychiatrist such as Dr. Robert Galatzer-Levy. Defendant argues that Ms. Levy's observations together with her professional opinion regarding Diante's competency were of vital importance to the defense case. Similarly, a witness such as Dr. Galatzer-Levy could have assisted the court by sharing his expertise regarding how children of Diante's age perceive truth and falsity and how they express themselves regarding a recollection of traumatic events. However, decisions concerning which witnesses to call and which evidence to present are considered to be trial strategies or tactics and ordinarily are not reviewable in the determination of whether counsel was ineffective. *People v. Munson*, 206 Ill. 2d 104, 139-40, 796 N.E.2d 155, 175 (2002); *People v. Adams*, 338 Ill. App. 3d 471, 477, 788 N.E.2d 252, 257 (2003). Moreover, although the trial judge later had the benefit of these proffers, in denying defendant's motions for new trial he nonetheless rejected the notion that the opinions of these experts would have changed his opinion concerning Diante's competency.

Defendant further challenges trial counsel's effectiveness for failing to present opinion evidence on the key issues of accidental strangulation and false confessions. Defendant argues that reasonably competent counsel would have supported the defense theory of the case by presenting expert testimony: (1) explaining the frequency with which and the circumstances under which children accidentally strangle themselves; and (2) explaining the nature of false confessions, the circumstances that may give rise to such confessions and the aspects of defendant's specific psychological profile that make her highly susceptible to giving a false confession.

However, as noted, decisions concerning which evidence to present and which witnesses to call generally fall within the rubric of trial strategy and cannot form the basis for a claim of ineffectiveness unless a strategy is so unsound that counsel can be said to have entirely failed to conduct any meaningful adversarial testing. *People v. Negron*, 297 Ill. App. 3d 519, 538, 697 N.E.2d 329, 342 (1998). Additionally, the teaching of *People v. Whittaker*, 199 Ill. App. 3d 621, 628, 557 N.E.2d 468, 472 (1990), is instructive; it is the defendant's burden to overcome the presumption that a decision to not call a witness is within the realm of trial strategy.

Although we are mindful that the subject of accidental strangulation is well within the expertise of forensic pathologists, defense counsel could well discern that given the changing opinions of Dr. Denton, the subject was adequately presented before the jury. However, as to the theory of false confessions, defendant has offered no Illinois decisions holding that such opinions are admissible. To be sure, expert testimony may be received under the helpfulness standard where it involves knowledge or experience that a juror generally lacks. *Kimble v. Earle M. Jorgenson Co.*, 358 Ill. App. 3d 400, 409, 830 N.E.2d 814, 823 (2005). However, we do not find any support for admissibility of false confession evidence in the authorities cited by defendant. See *People v. Miller*, 173 Ill. 2d 167, 186-88, 670 N.E.2d 721, 730-31 (1996) (DNA evidence admissible where generally accepted in the relevant scientific community); *People v. York*, 312 Ill. App. 3d 434, 437, 727 N.E.2d 674, 677-78 (2000) (counsel ineffective in failing to present exculpatory DNA evidence); *People v. Smith*, 236 Ill. App. 3d 35, 42, 603 N.E.2d 562, 566 (1992) (upholding admissibility of child psychologist's opinion as to victim's truthfulness). We recognize that opinions concerning false confessions have been admitted in other jurisdictions. See *United States v. Hall*, 93 F.3d 1337, 1345 (7th Cir. 1996), *aff'd*, 165 F.3d 1095 (1999); *Miller v. Indiana*, 770 N.E.2d 763, 774 (Ind. 2002); *Boyer v. Florida*, 825 So. 2d 418, 419 (Fla. App. 2002). However, absent a threshold determination that such evidence meets *Frye*'s general acceptance requirement, we have no position as to the admissibility of such evidence had it been offered. See *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923); *In re Commitment of Simons*, 213 Ill. 2d 523, 529-30, 821 N.E.2d 1184, 1188-89 (2004).

Finally, defendant faults trial counsel for "inexplicably" withdrawing her motion to quash arrest without argument or comment. Prejudice is said to have inured to the defendant as the motion purportedly had a reasonable probability of succeeding. We disagree. The record clearly reflects that the parties elected to proceed jointly on the motion to suppress statements as well as the motion to quash arrest. When the State rested on both motions, the defendant elected not to present evidence and likewise rested.

To sustain a claim of ineffectiveness deriving from failure to litigate a motion to quash and suppress, a defendant must establish that the motion would have been granted, thereby assuring a different result at trial. *People v. Rodriguez*, 312 Ill. App. 3d 920, 925, 728 N.E.2d 695, 702 (2000). Yet, here when both sides rested, the uncontroverted testimony offered utterly no support for the defense position. First, the evidence clearly established a voluntary accompaniment to Area 5. *People v. Eddmonds*, 101 Ill. 2d 44, 61, 461 N.E.2d

347, 355 (1984) (a person is not under arrest where he volunteered to meet with the police and was prepared to accompany them to the station). Second, upon arrival at the station defendant was not placed in an interrogation room, but rather in the "quiet room," a setting used for victims of sexual assault. Third, although defendant was questioned by the detectives, she was not a suspect or target; her status as a cooperating parent did not change until her spontaneous admission of guilt. Fourth, there was no custodial interrogation before defendant's lawful arrest. Given the state of the record, we fail to discern how defendant's motion to quash arrest had any semblance of success.

Finally, defendant contends that trial counsel's cumulative, but unspecified, errors also rendered the results of her trial unreliable as a matter of law. Trial counsel's failure to exhibit even a rudimentary understanding of trial advocacy is claimed to have compounded counsel's other noted deficiencies. However, defendant's failure to alert this court to the specifics of counsel's lack of understanding and how it impacted the results of the trial offers little insight into the merits of defendant's claim. As against defendant's claim of general deficiencies, we find that trial counsel did indeed subject the State's case to meaningful adversarial testing, even if it was not perfect. *Cf. United States v. Cronic*, 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039 (1984). Counsel filed and litigated a motion to suppress and thereafter invoked defendant's right to a speedy trial consistent with her desires. Counsel's opening and closing remarks before the jury conveyed an understanding of the defense theory as did their examination of State and defense witnesses. Overall, we find that counsel's representation fell within the wide range of reasonable performance. *People v. Griffin*, 178 Ill. 2d 65, 86, 687 N.E.2d 820, 833 (1997). Having given full consideration to defendant's ineffective assistance claim, in each of its particulars, we find that it has not been sustained.

For the reasons stated, we affirm the judgment of the circuit court and grant the State's request for fees in the amount of $100 for defending this appeal.

Affirmed.

FITZGERALD SMITH, P.J., concurs.

JUSTICE TULLY, dissenting:

The majority hold that defendant's motion to suppress her statements was properly denied. I disagree as to that portion of their holding and respectfully dissent.

*People v. Lopez*, 229 Ill. 2d 322 (2008), is not only legally instruc-

tive, but also factually. The defendant in *Lopez* was brought to a police station at approximately 1 p.m. regarding a murder. He was questioned and advised that someone had implicated him. He provided the detectives with information and was left alone in the same room for four to five hours while the detectives continued their investigation. Although defendant was unhandcuffed, he was never told he was free to leave the police station. Furthermore, he was later questioned by the same detectives that had brought him in, questioned him, and left him in the interview room. After being questioned again, the defendant made an oral confession whereupon the detectives stopped questioning him, gave him his *Miranda* warnings, and then terminated the interview. Two hours later, the defendant gave a handwritten statement memorializing his confession. This objective evidence, despite subjective evidence consisting of a detective's testimony denying that he used the "question first, warn later" technique or that defendant was a suspect, was sufficient to warrant suppression of defendant's subsequent handwritten confession. *Lopez*, 229 Ill. 2d. at 363.

In the case at bar, defendant was brought to a police station at around 8 or 9 p.m. regarding her son's death. She was questioned for about 30 minutes concerning the events of the incident. After providing the detectives with information, she was left alone in the room for about four hours as the detectives continued their investigation. Defendant was also unhandcuffed but never told she was free to leave the police station. Defendant, around 1 a.m., was questioned and confronted by the same detectives that had questioned her earlier and left her in the room. It was at this point that the defendant made an oral confession and was read her *Miranda* rights. Questioning was terminated and defendant was transferred to another room. After recanting shortly thereafter, defendant was subjected to an inconclusive polygraph test and multiple interrogations over the next 24 hours. She confessed a second time, was then told her confession was inaccurate, and then modified her confession once again, finally memorializing it through videotape.

The objective evidence between *Lopez* and the instant case is similar and therefore helpful in evaluating the case at bar. Furthermore, despite the State's argument, it is difficult to see how defendant's statement could have been "spontaneous" after four hours and two separate interview sessions. Moreover, the exchange in which defendant ultimately made her statement was one in which the detectives admitted to "confronting" defendant about inconsistencies in her information and accused her of lying. Moreover, the facts suggest that the detectives continually informed defendant of various inconsistencies and details overlooked by defendant several times.

Despite defendant confessing to the same result, the detectives felt compelled to continually encourage her to modify her statement until they were satisfied it conformed to the evidence. In any event, after considering the factors outlined in *Lopez*, this court should find that the evidence when viewed in its totality supports an inference that the detectives engaged in some form of "question first, warn later" interrogation.

The next question now is whether, after receiving midstream *Miranda* warnings, "a reasonable person, in defendant's situation, would have understood that he retained a choice about continuing to talk to police." *Lopez*, 229 Ill. 2d at 364. The relevant facts to consider are:

> "[T]he passage of time between the unwarned and warned statements, the location where those statements were taken, whether the same person questioned the suspect during the unwarned and warned statements, whether details obtained during the unwarned phase were used during the warned phase, and whether the suspect was advised that the unwarned statement could not be used against the suspect." *Lopez*, 229 Ill. 2d at 364-65.

Approximately 20 hours passed between defendant's unwarned and warned statements which I acknowledge is not an exceptionally long or short period of time. Next, both statements were taken at the police station in interview rooms. The interrogations preceding both statements, as well as all other interviews, were conducted by the same detective, often with other detectives present. Details obtained during the unwarned phase were clearly used during the warned phase, and nothing in the record indicates that defendant was advised that her unwarned statement could not be used against her.

In *Lopez*, the defendant was a juvenile who was questioned by an assistant State's Attorney and not a detective, had received *Miranda* warnings twice, and had his father present during his inculpatory statement as well. Despite this, his statement was ruled inadmissible because the same detective was present at both statements, they were taken near each other in time, and the defendant was never advised his oral statement was inadmissible. Here, despite a longer period of time in between the statements, defendant was treated similarly and experienced added stress where the same detective, with other detectives present, continuously questioned her. Under these circumstances, I cannot conclude that a reasonable person, in defendant's situation, would have understood that she retained a choice about continuing to talk to police, especially where she was never warned that her prior statement could not be used against her.

For the foregoing reasons, I respectfully dissent.